[Civ. No. 17247. First Dist., Div. One. Sept. 11, 1957.]

GRACE BOWMAN, as Administratrix, etc., Respondent, v. SANTA CLARA COUNTY et al., Appellants.

Leonard A. Worthington for Appellants.

Fernhoff & Wolfe for Respondent.

WOOD (Fred B.), J.—Plaintiff Sherrol Bowman† brought this action against the county, a sanitation district, an improvement district within the sanitation district, and Manuel Smith, general contractor, for compensation for certain trench digging work plaintiff performed as a subcontractor.

---

†Plaintiff died pending this appeal. His administratrix has been substituted as respondent but, for the sake of clarity and convenience, we will refer to the respondent as the plaintiff.

On the day that he started work (July 28, 1953) plaintiff prepared and he and Smith signed a written memorandum which said merely "Dig ditch for 18″ x 21″ x 24″ pipe at 50¢ per foot," identifying the job simply by the words, "Address of Job: Milpitas, Calif."

The court overruled defendants' contention that this, was a fully integrated contract which was unambiguous in its terms and that none of the negotiations that led up to it and no terms not expressed in it could be considered.

Plaintiff Bowman testified that he was engaged in the business of sewer contracting. In July of 1953 Smith came to Bowman's house with the plans for the ditch and wanted to know if Bowman had a machine with which he could dig ditches big enough to install a 24 inch pipe. Bowman said he had such a machine. Smith asked what Bowman would dig the ditch for and said Bowman would have to dig 400 feet a day. Bowman "meditated a little while and then I told him I'd dig it for fifty cents a foot. 'Now, remember,' he [Smith] says, 'I've got to have 400 feet a day.' " About a week later Smith returned and told Bowman to go ahead, telling the latter he would have to dig 400 feet a day.

Bowman also testified that 400 feet per day was an average rate of production in his business and "that is on what we base our figures."

The work started on the 28th of July. During that day the written portion of the agreement was signed. From then until August 21, when Bowman quit, there were numerous delays, resulting in an average rate of production of only 100 feet per day. On one occasion he was required to move his machine from one end of the job to the other to dig a test hole. He was unable to dig any ditch that day. On occasion he would dig 25 feet and then Smith would stop him for the rest of the day. He said the interruptions were caused by Smith's failure to have enough men and materials to do the bracing of the trench behind the machine as the digging proceeded. It was usual and customary for the general contractor to do the bracing.

Two men were on the job each working day between July 28 and August 21, an operating engineer and an oiler employed by plaintiff. The plaintiff substituted on occasion when the engineer did not show up.

Plaintiff said he pulled off the job on August 21 because of the shutdowns, Smith's refusal at that time to pay for the same, and the resulting failure to dig enough to make expenses.

In a few days plaintiff received a letter from Smith's attorney demanding that plaintiff resume work. On the 28th of August plaintiff returned to the job, writing Smith in part as follows: "I stopped digging on this job about Friday, August 21st, for the reason that your superintendent continually kept me from going ahead with the work. We would go a few feet and then be stopped. We cannot keep men and equipment idle on the job and dig ditches at $.50 per foot. I have, pursuant to your demand, commenced digging ditches on this job again today. Hereafter unless we are permitted to proceed continually with the ditch digging, we will charge any time that we are stopped from digging a rate per hour as the cost would be were we permitted to proceed according to the number of feet per hour we would normally work at $.50 per foot. Therefore, in the future it will be necessary to bill you and I will so bill you at this rate for the amount of time each day that we are prevented from proceeding with the regular digging."

There were further interruptions in the work from then on, from the same causes, in respect to which plaintiff billed Smith at the rate of $17 per hour (which plaintiff testified was a reasonable rate of compensation) and a few hours of showup time (two hours pay per man, required by union rules when a man reports for work and then is told there is no work for the day) at $5.21 per hour.

This evidence was admissible. It did not vary the writing, which merely specified the rate of pay per lineal foot and did not represent a complete integration of the agreement. Its incompleteness appeared upon the face of the writing. It left various important elements unexpressed. Where was this trench to be dug? Between what points and along what course? How deep was it to be? When was the work to commence? Was it to be completed within a limited period of time? What was the required rate of progress, if any per day? The answers to many of these questions, doubtless, would be furnished by the sanitation district's plans and specifications. The required rate of progress, Bowman's testimony showed, was 400 lineal feet per day. It was not in conflict with the portion of the contract which they put in writing, a piece price rate, 50 cents per lineal foot.

The parol evidence rule applies "[w]hen the terms of an agreement have been reduced to writing." (Code Civ. Proc., § 1856.) It sometimes happens, as in this case, that the parties put in writing only a portion of their agreement.

In such a case it is competent to prove the unwritten portion if not inconsistent with the written portion of the agreement.

■ "It has long been the rule that when the parties have not incorporated into an instrument all of the terms of their contract, evidence is admissible to prove the existence of a separate oral agreement as to any matter on which the document is silent and which is not inconsistent with its terms. (*Buckner* v. *A. Leon & Co.*, 204 Cal. 225, 227 [267 P. 693] [buyer of grapes deemed to have agreed to furnish lug boxes pursuant to local custom; the writing was silent on that subject]; *Crawford* v. *France*, 219 Cal. 439, 443 [27 P.2d 645] [writing specified architect's fee as a percentage of construction cost but was silent as to latter; parol evidence competent to show agreed limit of cost of construction]; *Stockburger* v. *Dolan*, 14 Cal.2d 313, 317 [94 P.2d 33, 128 A.L.R. 83] [oral understanding that lessee under oil lease would procure a zone variance, provable by parol evidence because not inconsistent with written portion which was silent on that subject]; *Lindsay* v. *Mack*, 5 Cal.App.2d 491, 496-497 [43 P.2d 350] [parol evidence rule does not apply to a collateral agreement upon which the instrument is silent and which does not purport to affect the terms of the instrument]; *Gibson* v. *De La Salle Institute*, 66 Cal.App.2d 609, 631-632 [152 P.2d 774] [writings specified kinds, quantities and prices of wine sold but were silent as to such details as storage, place of delivery, transportation to shipping point, etc., which it was proper to show if governed by usage or if orally agreed].)" (*American Industrial Sales Corp.* v. *Airscope, Inc.*, 44 Cal.2d 393, 397 [282 P.2d 504, 49 A.L.R.2d 1344].) ■ An unwritten term of an agreement may sometimes be supplied by aid of a local or a trade custom. (*Isenberg* v. *California Emp. Stab. Com.*, 30 Cal.2d 34, 37 [180 P.2d 11], custom or usage to the effect that the owner of a string of race horses has control over free lance jockeys engaged by him; *Buckner* v. *A. Leon & Co.*, *supra*, 204 Cal. 225, 227; *Pastorino* v. *Greene Bros.*, 90 Cal.App.2d 841, 845 [204 P.2d 368], a custom that the master of a vessel has exclusive control of the vessel during the period of his employment; *Gibson* v. *De La Salle Institute*, *supra*, 66 Cal.App.2d 609, 631-632.)

The parol evidence thus admitted supports the trial court's findings that on July 28, 1953, Bowman and Smith entered into a contract the written memorandum of which did not contain all the terms; the contract provided for digging 400 feet of trench per day at the date of 50 cents per foot; and

it was agreed that the rate would be higher if plaintiff were not allowed to dig at the rate of 400 feet per day; Bowman stopped work on July 28 [August 21] because of undue standby time and returned to work on August 28 after an exchange of letters which constituted an agreement by Smith to pay a reasonable sum for standby time thereafter; Smith has been billed for this standby time and reasonable compensation therefor is $17 per hour; Bowman is entitled to reasonable compensation for showup time, which is $5.21 per hour.

Defendants would discount plaintiff's testimony concerning the original arrangement because he did not for about a year bill Smith for the shut-downs which occurred between July 28 and August 21.* That goes to the weight of his testimony concerning the terms of the contract, which the trier of the facts decided against defendants' contention. Plaintiff testified that during that first period he did not keep a daily record of standby time and that Smith's refusal to sign a "tag" or "a bill on the job" for standby time made it "absolutely necessary to keep a daily record," which he did keep after resuming work. It is not inconceivable that plaintiff desired to adjust his grievances informally and urge the defendant to change the conditions so that digging would proceed faster rather than make formal demands for standby time during that first period. A finding of waiver is not inconsistent with the finding of an agreed rate of production of 400 feet per day. ■ A waiver may be shown by conduct. What conduct constituted a waiver is here a question of fact. (*Medico-Dental Bldg. Co.* v. *Horton & Converse*, 21 Cal.2d 411, 432 [132 P.2d 457].) ■ The existence of a waiver is not inconsistent with the existence of an obligation. The former must depend upon the latter. ■ In the continuing obligation cases, a waiver of a breach up to a certain time does not necessarily preclude the promisee from asserting a subsequent breach. (*Woodard* v. *Glenwood Lbr. Co.*, 171 Cal. 513, 523 [153 P. 951] ; 12 Cal.Jur.2d 479, Contracts, § 251.)

Defendants argue that since the written contract was prepared during the first day's work, at a time when according to the daily average of digging during this period, less than a proportionate part of 400 feet was dug, plaintiff would have mentioned the 400 feet per day if it was a condition of the contract. This also was a matter for consideration of the

---

*The court found that plaintiff was not entitled to recover the value of the standby time for the July 28-August 21 period; apparently upon the theory of waiver, because of the long delay in billing Smith for it.

trier of the facts. Besides, we find nothing in the record that shows how many feet were dug the first day.

Defendants assert that plaintiff's letter of August 28 was ineffectual to accomplish its purpose because there was no consideration for it and no consent by Smith. This argument depends upon the erroneous assumption that the writing of July 28 contained the whole contract and obligated Bowman to do the work at 50 cents per lineal foot no matter how many weeks or months Smith delayed him on the job, which at the agreed rate of production would be completed in about 16 working days. When Smith, by his interruptions and delays, prevented Bowman from proceeding faster, on the average, their one-fourth of the agreed rate, Bowman was not remediless. There was an implied obligation upon Smith's part to make reasonable compensation for the delays. That became an express obligation through the medium of Bowman's letter of August 28, his return to the job and his furnishing and Smith's receiving the standby service. Here we find both consideration and consent. A somewhat similar situation arose in *McConnell* v. *Corona City Water Co.*, 149 Cal. 60 [85 P. 929, 8 L.R.A.N.S. 1171]. Plaintiff contracted to build a tunnel. Defendant was to furnish the material for the timbering. The material furnished by defendant was inferior and the tunnel collapsed. The plaintiff was allowed to recover the value of his extra work in repairing the tunnel, since the collapse of the tunnel was not his fault.

Defendants say the findings are fatally defective for failure expressly to find that all of the interruptions and delays were caused by Smith. The court did find that none were "caused by plaintiff's fault." Significantly, the agreements found by the court did not confine plaintiff's right to recompense to those delays that were caused solely by Smith. The first agreement was that "the rate would be higher if plaintiff was not allowed to dig at the rate of 400 feet per day." The second was that defendant would pay "a reasonable sum for standby." Plaintiff testified that the delays were the fault of Smith. The inspector would sometimes stop the digging because the ditch bracing was not keeping up with the digging machine, but this was due to the fact that Smith did not have adequate equipment and material and enough men to do the bracing. In view of this testimony, it is difficult to see how the court could have found that the standby time was caused by anything other than the defendant Smith's fault. Plaintiff was given standby compensation only for the time the

machine was not working, and the machine was not working because of delayed bracing and backfilling which was Smith's responsibility. ■ In view of the agreements here involved, it would not seem necessary that the court make a finding that the delay was caused by Smith's fault. Even if such a finding were necessary, it would have been adverse to Smith, and the judgment would not be reversed on that ground. (*Miller* v. *Ambassador Park Syndicate,* 121 Cal.App. 92, 97 [9 P.2d 267].)

■ Defendants say that there is "a serious question if the county can be liable for something which 'was not done on the job.'" They claim that liability for standby service is not within the purview of the county's statutory obligation. They refer to sections 5292 and 5293 of the Streets and Highways Code which give a lien and a right of action if the contractor fails to pay the claim of a person "furnishing materials, provisions, provender or other supplies used in, upon, for or about the performance of the work contracted to be executed or performed, or [of] any person renting or hiring teams or implements, or machinery for, or contributing to, the work to be done, or [of] any person who performs work or labor upon the same, or [of] any person who supplies both work and materials . . ." Standby service rendered by plaintiff as well as trench digging actually done by him seem clearly within the purview of the statute. Compensation for such standby service includes a return to plaintiff for his investment in the machine, his outlay for the wages paid his workmen, and his own wages of management while the men and the machine were kept on the job by plaintiff pursuant to his contract with Smith, available for trench digging whenever needed.

The defendant surety company contends that it was released from any obligation toward Bowman when he changed the principal's obligation toward him upon his return to work on August 28 under the new arrangement as found by the court.

The answer is twofold. ■ The first answer is that this is a statutory bond which the contractor is required to give for payment of claims of workmen, material men and suppliers of equipment. Any such claimant acquires a lien on the assessment and on the bond and may sue upon the bond. (See Sts. & Hy. Code, §§ 5293 and 5297.) The bond has a dual purpose, protection of the public agency concerned and of the workmen, material men and suppliers. It is not geared to the specific terms of any particular agreement that the contractor has or

may execute with any particular workman, supplier, or material man. It is in that regard unlike the ordinary suretyship contract whereby one person guarantees the faithful and punctual performance of a particular contract which his principal has entered into with another person.

The second answer is that it is too late to raise this question for the first time upon appeal. (*Blackwood* v. *McCallum*, 187 Cal. 655 [203 P. 758].) The element of surprise if present well might excuse the delayed presentation of this point. However, that element is lacking. A mere perusal of the complaint would put the surety company upon notice of its need to plead such a defense. The complaint alleged there was a collateral understanding that plaintiff would be allowed and required to dig 400 feet per day; that 50 cents per foot is a reasonable charge if 400 feet per day were dug; and that Smith refused to allow plaintiff to proceed at the agreed rate. The allegations as to the amount of damages suffered included the number of hours of standby time demanded and the rate per hour for standby time. Here was express notice of a claim which, according to the surety's view of the case, was a variance from the original contract; emphasized and reemphasized by plaintiff's opening statement and by plaintiff's testimony. Moreover, the concept of a new contract or a modification of the original contract by exchange of letters was in the mind of counsel for the surety company during the trial. Upon cross-examination he asked plaintiff ". . . was it your intent at that time to make a new contract with Manuel Smith to charge him with for standby time . . .? Is that what you were doing?" "A. Yes, that is what I was doing." At least as early as the giving of that answer the surety company could have asked for an amendment to its pleading and could thus have tendered the issue whether the change was of so material a nature as not to be within the scope of the surety company's obligation. We do not perceive here any such element of surprise as would excuse the surety company's failure to plead release of its obligation because of an asserted material modification of its principal's obligation toward the plaintiff.

The judgment is affirmed.

Peters, P. J., and Bray, J., concurred.