[No. H022467. Sixth Dist. Mar. 21, 2003.]

SCOTT CO. OF CALIFORNIA, Plaintiff and Appellant, v.
UNITED STATES FIDELITY & GUARANTY INSURANCE COMPANY
et al., Defendants and Respondents.

## COUNSEL

McInerney & Dillon, Timothy F. Winchester and Jewell J. Hargleroad for Plaintiff and Appellant.

Morgenstein & Jubelirer, Eliot S. Jubelirer, Rocky N. Unruh and Bruce A. Wagman for Defendant and Respondent American Insurance Company

The Banchero Law Firm, E. Jeffery Banchero and Robert M. Lichtman for Defendants and Respondents United States Fidelity & Guaranty Insurance Company and Aetna Casualty and Surety Company.

## OPINION

**ELIA, J.**—This is the second appeal arising from a subcontractor's effort to recover damages for cost overruns in a public works project. After succeeding at trial against the general contractor, plaintiff Scott Co. of California

(Scott) sought damages and attorney fees against the contractor's sureties on the payment bond. The trial judge denied the sureties' summary judgment motion, but a different judge granted the sureties' motion to reconsider and then granted their summary judgment motion. In this appeal Scott contends that the court lacked jurisdiction to grant reconsideration and erred in finding the sureties to be entitled to judgment as a matter of law. We find merit in the second argument with regard to Scott's attorney fees and must therefore reverse the judgment.

### Background

This action arose in December 1990, when Scott, a mechanical subcontractor, sought damages it had incurred during the construction of the San Jose Convention Center. Among the named defendants in Scott's lawsuit were the general contractor, Blount, Inc. (Blount); the owner of the property, the Redevelopment Agency of the City of San Jose (RDA); and three sureties that had issued a "Labor and Material Payment Bond" to Blount.[1] These sureties, respondents in the present appeal, are United States Fidelity & Guaranty Insurance Company, Aetna Casualty and Surety Company, and American Insurance Company (collectively the Sureties). Scott alleged that Blount, the principal, had failed to reimburse Scott for large cost overruns Scott had suffered due to delays and change orders for which Blount was responsible.

The 10th cause of action in Scott's first amended complaint asserted a "Claim on Payment Bond" against the Sureties. Scott alleged that the Sureties had issued the payment bond to Blount under Civil Code sections 3247 to 3252, thereby assuring Scott payment for its provision of services and materials. Scott further charged the Sureties with bad faith in their failure to work toward a prompt investigation and settlement of Scott's demands for payment.

In October 1991 Scott settled with RDA. RDA agreed to pay Scott $1,439,888 in exchange for dismissal of all claims against RDA, including those attributable to unpaid work performed, change orders, and delay costs. Scott then proceeded against Blount in a court trial heard by the Honorable Robert H. Kroninger, retired.

---

[1]When a government entity awards a contract for a public improvement costing more than $25,000, the contractor must file a payment bond with that entity under Civil Code section 3247. This statutory procedure, along with the stop notice, affords labor and materials suppliers a remedy, since a mechanic's lien may not be filed against public property. (*Liton Gen. Engineering Contractor, Inc. v. United Pacific Insurance* (1993) 16 Cal.App.4th 577, 584 [20 Cal.Rptr.2d 200]; *California Elec. Supply Co. v. United Pac. Life Ins. Co.* (1964) 227 Cal.App.2d 138, 144 [38 Cal.Rptr. 479].)

Scott claimed more than $2 million in losses attributable to Blount. Judge Kroninger found Blount liable for negligence and inadequate management of the project, but found Scott responsible for some of its damages. The final judgment awarded Scott $442,054. Scott also obtained costs, including attorney fees, incurred before Blount made a settlement offer (Code Civ. Proc., § 998; hereafter section 998), but Blount obtained postoffer costs, which exceeded Scott's recovery, yielding a net amount owed by Scott to Blount of $46,726.86.

By stipulation of Scott and the Sureties, the causes of action against the Sureties were held in abeyance while both Blount and Scott appealed from the judgment and the postjudgment order of costs. After completion of the appellate process, including review by the Supreme Court,[2] the matter returned to Judge Kroninger, over Scott's opposition, for determination of costs and disposition of the pending claim against the Sureties.[3]

Scott subsequently sought to remove Judge Kroninger from the case, asserting "bias and prejudice." The Honorable Conrad Lee Rushing, however, rejected both Scott's peremptory challenge and its challenge for cause. This court denied Scott's petition for a writ of mandate to overturn that decision, and the Supreme Court denied review (*Scott Co. v. Superior Court* (July 25, 2000, H021656)). Scott subsequently tried again to disqualify Judge Kroninger for bias, but that effort also was unsuccessful.

While those challenges to Judge Kroninger were pending, the Sureties filed a motion for summary judgment, asserting no liability to Scott either for damages or for the costs that followed Blount's rejected section 998 offer. They argued that their liability for Scott's cost overruns was co-extensive with that of Blount, that Blount was not in default, and that the issue of Blount's (and therefore their own) liability was either res judicata or law of the case. In response, Scott maintained that the Sureties' liability was completely independent of Blount's, and that this "public works payment bond" covered *all* damages as well as attorney fees. Thus, Scott insisted that it was entitled to recover from the Sureties $1,214,378.10, representing its

---

[2]See *Scott Co. v. Blount, Inc.* (1999) 20 Cal.4th 1103 [86 Cal.Rptr.2d 614, 979 P.2d 974], pertaining to the allocation of pre- and postoffer costs between the parties.

[3]Scott and Blount had stipulated that Judge Kroninger would "try any and all issues in the action," rule on summary judgment motions, and decide all "post-trial matters and motions." After this court's remittitur issued, however, Scott opposed Judge Kroninger's hearing of the causes of action against the Sureties. However, the superior court (Hon. Conrad Lee Rushing) found that the parties had intended to refer the entire case, including the claims against the Sureties, to Judge Kroninger and ordered the matter referred accordingly. Scott's petition to this court for a writ of mandate was summarily denied (*Scott Co. v. Superior Court* (July 27, 2000, H021737)).

$1.9 million cost overruns, less the amount of the settlement with RDA and an amount corresponding to the hours for which Scott itself was responsible.

Judge Kroninger initially heard the motion on August 2 and then continued it to October 5, 2000. The continuance enabled both parties to submit supplemental briefs on the issue of the Sureties' independent liability. In its supplemental brief, filed two days before the hearing, Scott relied on *R.P. Richards, Inc. v. Chartered Construction Corp.* (2000) 83 Cal.App.4th 146 [99 Cal.Rptr.2d 425] (*R.P. Richards*), a Second District case decided August 18, 2000. Scott argued that because the Sureties had not been a party to Blount's settlement offer and were released from their obligation on the bond, they would not have been liable had Scott accepted the offer and Blount thereafter defaulted. Because the settlement would have been unenforceable against them, the Sureties "cannot have it both ways" by benefiting from the offer.

The parties and the court discussed the applicability of the *R.P. Richards* case. The Sureties pointed out that *R.P. Richards* did not involve a section 998 offer. They argued that both Blount's and Scott's offers encompassed the Sureties as well as Blount, and that they would have been liable for the amount of the offer had either offer been accepted and Blount then defaulted. Furthermore, they maintained, Scott was not entitled to any more than it had received from Blount, because "[t]he sureties' obligation is the same as Blount's."

Judge Kroninger, however, determined that this case was "absolutely parallel" to *R.P. Richards*. Had there been no section 998 offer by Blount, he reasoned, then judgment would have been for Scott, which would have received all of its costs, including attorney fees. Neither Blount's nor Scott's offer had expressly purported to bind the Sureties in the event of Blount's default. If indeed the Sureties had intended to be bound by Blount's settlement offer, as they now claimed, that was a viable factual issue for trial, but no such fact had been established for purposes of disposition by summary judgment.

Judge Kroninger therefore concluded that the Sureties had not made a sufficient showing to justify summary judgment "as to the damages consisting of attorney fees at the trial level which were not reimbursed"—that is, the fees that Scott had incurred after Blount's section 998 offer. He emphasized that Scott would *not* be entitled to reopen "the case on the merits," and he questioned "how far [Scott was] likely to get" by pursuing the damages attributable to RDA in a trial against the Sureties. Nevertheless, Judge

Kroninger declined to formally rule on the viability of Scott's claim for those damages because the Sureties had not moved for summary adjudication. To allow time for discovery within the five-year statutory limit on the lawsuit, the judge set a trial date for November 3, 2000.

The day after this hearing Scott advised Judge Kroninger of its intention to petition for another writ of mandamus to compel him to disqualify himself for bias. Judge Kroninger initially refused to withdraw from the case, but after further correspondence from Scott,[4] he announced his intention to resign. The Sureties asked the judge to withhold a final ruling on their motion to enable them to brief the issue created by the recent *R.P. Richards* case. On October 16, however, Judge Kroninger filed the order denying the Sureties' motion for summary judgment. The following day he filed his notice of withdrawal from further proceedings in the case.

On October 25, 2000, the Sureties moved for reconsideration under Code of Civil Procedure section 1008, citing "new or different facts, circumstances and law." The Sureties asserted that the denial of summary judgment was "based on a patently erroneous premise which the Sureties had no opportunity to address on brief, and also because it was signed by Judge Kroninger in the context of coercive circumstances attributable to Scott's unrelenting and baseless campaign to secure his removal—a campaign which led to his withdrawal almost immediately after he signed the Order." Had they been afforded sufficient opportunity to respond to Scott's new citation of *R.P. Richards*, they would have shown that Civil Code section 2822, subdivision (b), which they characterized as "different law," "flatly preclude[s] the rationale employed in denying their motion."

The motion for reconsideration was heard on November 7 and 8, 2000, by Judge Rushing. Citing Civil Code sections 3226, 3248, and 3250, Scott repeated its assertion that although Blount did not owe any money, the Sureties did because they were primarily and independently liable "for all labor and material [Scott had] contributed" and for all construction delays caused by the owner, RDA.[5] It would not even have been necessary, in Scott's view, to sue Blount. The Sureties, however, characterized Scott's

---

[4]Scott pointed out to Judge Kroninger that if he chose to withdraw by October 13, "there would be no necessity on behalf of Scott to file a petition for a writ of mandamus." Scott, however, describes Judge Kroninger's withdrawal as one made "for his own personal reasons" and implies that the judge withdrew upon becoming aware that the trial would last longer than the half-day he had expected.

[5]Scott informed the court that the Sureties owed $772,000, significantly less than the claim they asserted in their opposition to summary judgment, which exceeded $1.2 million plus interest, attorney fees, and "any other stat[u]tory obligations." Deducting the amount of

position as a renewed attempt to impose joint and several liability on Blount and RDA, an argument that had been rejected on appeal. They were "not the RDA's sureties. They are Blount's sureties. The case with Blount is over." Even if Blount somehow were in default, they added, the Sureties would not be liable for *all* of Scott's overruns whatever the cause.

The court agreed with the Sureties and granted their motion for reconsideration at the conclusion of the hearing. On December 1, 2000, the court granted the Sureties' motion for summary judgment.

*Discussion*

### 1. *Motion for Reconsideration*

Scott first contends that the court lacked jurisdiction to grant the Sureties' motion for reconsideration because they had failed to meet the strict requirements of Code of Civil Procedure section 1008.[6] Subdivision (a) of this statute allows a party to seek reconsideration of an order based on "new or different facts, circumstances, or law." In applying this subdivision, courts have required the moving party to demonstrate not only the grounds for reconsideration, but also a satisfactory explanation for the failure to present earlier the new circumstances, evidence, or law. (See, e.g., *Garcia v. Hejmadi* (1997) 58 Cal.App.4th 674, 689 [68 Cal.Rptr.2d 228]; *Lucas v. Santa Maria Public Airport Dist.* (1995) 39 Cal.App.4th 1017, 1028 [46 Cal.Rptr.2d 177].)

We agree with Scott that the Sureties failed to satisfy the statutory requirements for reconsideration under section 1008. Neither *R.P. Richards* nor Civil Code section 2822 constituted "new or different law" that was unavailable to the Sureties before the summary judgment hearing. As Judge Kroninger observed, the issue of the effect of Blount's settlement offer on the Sureties' liability had been "an issue from the beginning." At the hearing, counsel for the Sureties stated that she was familiar with *R.P. Richards*.[7] She agreed with the court's summary of the holding, and the parties extensively discussed the effect of the holding on the facts before the court. There is no support in the record for the Sureties' assertion that they had had an inadequate opportunity either to respond to Scott's citation of

---

Scott's damages award against Blount from its original estimate yields approximately $772,378. In its appellate briefs, Scott maintains that it "remains unpaid in the amount of $772,940.12."

[6]Further statutory references to section 1008 are to Code of Civil Procedure section 1008.

[7]Indeed, the Sureties themselves cited *R.P. Richards* in their own supplemental brief, in the context of their argument that they were no longer liable once their principal (Blount) had paid the amounts for which it was responsible.

*R.P. Richards* or to cite Civil Code section 2822 during the summary judgment proceedings. Instead, the motion appears to be derived from the Sureties' dissatisfaction with Judge Kroninger's application of *R.P. Richards* and their hope that another round of argument might convince the next judge that they were entitled to summary judgment.[8]

The next question is whether the Sureties' failure to comply with section 1008 deprived Judge Rushing of the authority to reconsider Judge Kroninger's denial of summary judgment. That the motion was presented to a different judge is not controlling; whether or not the Sureties were forum shopping to obtain a more favorable ruling, it is undisputed that Judge Kroninger was unavailable. In such circumstances a second judge is authorized to entertain a reconsideration motion. (§ 1008, subd. (a); *International Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 784, 786, fn. 2 [72 Cal.Rptr.2d 849]; *Ziller Electronics Lab GmbH v. Superior Court* (1988) 206 Cal.App.3d 1222, 1232 [254 Cal.Rptr. 410].)

Subdivision (e) of section 1008 expressly provides that the statute "specifies the court's jurisdiction with regard to applications for reconsideration of its orders and renewals of previous motions, and applies to all applications to reconsider any order of a judge or court, or for the renewal of a previous motion, whether the order deciding the previous matter or motion is interim or final. No application to reconsider any order or for the renewal of a previous motion may be considered by any judge or court unless made according to this section." Relying on this provision, Scott contends that the Sureties' failure to comply with subdivision (a) of section 1008 compels reversal because the court had no jurisdiction to reconsider the order denying summary judgment.

Some courts, most notably the First District, Division Two, have construed section 1008 strictly, holding that a court acts in excess of its jurisdiction when it grants reconsideration in the absence of the showing set forth in subdivision (a). (See, e.g., *Gilberd v. AC Transit, supra,* 32 Cal.App.4th at p. 1500 [court exceeds jurisdiction by granting motion not supported by statutory showing]; *Baldwin v. Home Savings of America* (1997) 59 Cal.App.4th 1192, 1200 [69 Cal.Rptr.2d 592] [§ 1008 is jurisdictional]; *Pazderka v. Caballeros Dimas Alang, Inc.* (1998) 62 Cal.App.4th

---

[8]On appeal the Sureties do not supply argument for the second ground for their motion, that Judge Kroninger's withdrawal, a response to an "unrelenting and baseless campaign to remove him," constituted new circumstances justifying reconsideration. In any event, Scott correctly points out that the circumstances surrounding Judge Kroninger's withdrawal were collateral to the merits of the issues in the parties' dispute. (Cf. *Garcia v. Hejmadi, supra,* 58 Cal.App.4th at p. 690; *Gilberd v. AC Transit* (1995) 32 Cal.App.4th 1494, 1500 [38 Cal.Rptr.2d 626].)

658, 669-670 [73 Cal.Rptr.2d 242] [same]; cf. *Crotty v. Trader* (1996) 50 Cal.App.4th 765, 770-771 [57 Cal.Rptr.2d 818] [court has no authority to reevaluate or reanalyze facts and law already presented in the prior motion]; see also *Morite of California v. Superior Court* (1993) 19 Cal.App.4th 485, 492-493 [23 Cal.Rptr.2d 666] [court may not ignore jurisdictional limitations of § 1008 by simply ignoring predecessor judge's order]; *Garcia v. Hejmadi, supra,* 58 Cal.App.4th at pp. 686-687 [even if Code Civ. Proc., § 473 order is construed as reconsideration ruling under § 1008, court had no jurisdiction to grant relief where new information had been available and no satisfactory explanation was presented for not raising it earlier].)

Other districts have allowed courts to reconsider their rulings on their *own* motions. (See, e.g., *Darling, Hall & Rae v. Kritt* (1999) 75 Cal.App.4th 1148, 1156-1157 [89 Cal.Rptr.2d 676] [§ 1008 does not affect the trial court's inherent authority to reevaluate its decisions sua sponte, prior to entry of judgment]; *Case v. Lazben Financial Co.* (2002) 99 Cal.App.4th 172 [121 Cal.Rptr.2d 405] [§ 1008 restricts only litigants' motions, not court's sua sponte reconsideration of its own orders]; *Bernstein v. Consolidated American Ins. Co.* (1995) 37 Cal.App.4th 763, 774 [43 Cal.Rptr.2d 817], disapproved on another ground in *Vandenberg v. Superior Court* (1999) 21 Cal.4th 815, 841, fn. 13 [88 Cal.Rptr.2d 366, 982 P.2d 229] [upon request for clarification, correction of prior ruling denying summary adjudication permissible on court's own motion].)[9]

Still other courts have allowed modification of rulings upon a party's motion, *notwithstanding* that party's failure to advance new or different facts, circumstances, or law. (See, e.g., *Remsen v. Lavacot* (2001) 87 Cal.App.4th 421, 426-427 [104 Cal.Rptr.2d 612] [order granting interest to beneficiaries of trust properly modified]; *Kollander Construction, Inc. v. Superior Court* (2002) 98 Cal.App.4th 304, 311-314 [119 Cal.Rptr.2d 614] [agreeing with *Remsen* but finding satisfaction of § 1008 requirements in any event]; accord, *Blake v. Ecker* (2001) 93 Cal.App.4th 728, 739, fn 10 [113 Cal.Rptr.2d 422] [inherent power to reconsider exists even after end of 10-day period to bring motion]; *Wozniak v. Lucutz* (2002) 102 Cal.App.4th 1031, 1042 [126 Cal.Rptr.2d 310].) These courts hold that a trial court has inherent power under the California Constitution to reconsider an interim ruling, a power that is "neither confined by nor dependent on statute." (*Kollander Construction, Inc. v. Superior Court, supra,* 98 Cal.App.4th at p. 311.) Our own view is closer to this third line of cases.

---

[9]Recently the First District, Division Three, adopted the same position as *Darling, Case* and *Bernstein.* In *Kerns v. CSE Ins. Group* (2003) 106 Cal.App.4th 368 [130 Cal.Rptr.2d 754], the court construed section 1008 to be "jurisdictional and controlling" only when a party has renewed a motion or requested reconsideration, not when the trial court reconsiders its ruling sua sponte.

Subdivision (e) of section 1008 was added to the statute in 1992. Before this amendment, reconsideration was based on a "different state of facts." (Stats. 1978, ch. 631, § 2, p. 2084.) A party's failure to show "new facts" did not render the court powerless to reconsider its rulings, because the court had "inherent power" to reconsider its interim rulings. (*Tutor-Saliba-Perini Joint Venture v. Superior Court* (1991) 233 Cal.App.3d 736 [285 Cal.Rptr. 1]; accord, *People ex rel. Dept. of Transportation v. Ad Way, Inc.* (1992) 8 Cal.App.4th 309, 313-314 [11 Cal.Rptr.2d 407]; *Robbins v. Los Angeles Unified School Dist.* (1992) 3 Cal.App.4th 313, 317 [4 Cal.Rptr.2d 649].)

In enacting the 1992 amendment, however, the Legislature rejected the appellate courts' holdings that interim rulings were outside the reach of the statute. It expressly declared its intent "to clarify that *no motions to reconsider any order made by a judge or a court, whether that order is interim or final, may be heard unless the motion is filed within 10 days . . . and unless based on new or different facts, circumstances, or law.*" (Stats. 1992, ch. 460, § 1, p. 1831, italics added.) The Legislature also emphasized that no *renewal* of a previous motion may be heard "unless the motion is based on new or different facts, circumstances, or law." (*Ibid.*) Lest courts purport to reconsider a ruling sua sponte, the Legislature added subdivision (c), which allows a court to do so only upon "a change of law that warrants [reconsideration]." (§ 1008, subd. (c).)

Based on the express language of subdivision (e) of section 1008, there can be no question that the legislative changes of 1992 were intended to make the procedural requirements of section 1008 "exclusive and jurisdictional." (*Garcia v. Hejmadi, supra,* 58 Cal.App.4th at p. 688.) By imposing these restrictions on interim as well as final rulings, the Legislature sought "to reduce the number of motions to reconsider and renewals of previous motions heard by judges in this state." (Stats. 1992, ch. 460, § 1, p. 1831.)

On the other hand, the Supreme Court has recognized the "inherent powers of the court . . . to insure the orderly administration of justice." (*Hays v. Superior Court* (1940) 16 Cal.2d 260, 264 [105 P.2d 975]; *Walker v. Superior Court* (1991) 53 Cal.3d 257, 266-267 [279 Cal.Rptr. 576, 807 P.2d 418].) These powers "are derived from the Constitution," specifically, article VI, section 1, of the California Constitution, which confers the judicial power on the courts. (*Walker v. Superior Court, supra,* 53 Cal.3d at p. 267; *Kollander Construction, Inc. v. Superior Court, supra,* 98 Cal.App.4th at p. 311.) The resolution of "specific controversies" is regarded as a "core" or "essential" function of the judicial branch, which "may not be usurped by another branch." (*People v. Bunn* (2002) 27 Cal.4th 1, 14 [115 Cal.Rptr.2d

192, 37 P.3d 380]; see also *Marin Water etc. Co. v. Railroad Com.* (1916) 171 Cal. 706, 711-712 [154 P. 864] [judicial function is to " 'declare the law and define the rights of the parties under it' "]; see also *Title etc. Restoration Co. v. Kerrigan* (1906) 150 Cal. 289, 319 [88 P. 356] ["It is not to be disputed that, as a general proposition, the judicial function is the determination of controversies between parties"].)

Article III, section 3 of the California Constitution (article III, section 3) states: "The powers of state government are legislative, executive, and judicial. Persons charged with the exercise of one power may not exercise either of the others except as permitted by this Constitution." There is "no sharp line" between the roles of the three branches, and it is commonly noted that each branch may oversee and influence the others. (*People v. Bunn, supra*, 27 Cal.4th at p. 14; *Case v. Lazben Financial Co., supra*, 99 Cal.App.4th at p. 184.) "Indeed, upon brief reflection, the substantial interrelatedness of the three branches' actions is apparent and commonplace: the judiciary passes upon the constitutional validity of legislative and executive actions, the Legislature enacts statutes that govern the procedures and evidentiary rules applicable in judicial and executive proceedings, and the Governor appoints judges and participates in the legislative process through the veto power. Such interrelationship, of course, lies at the heart of the constitutional theory of 'checks and balances' that the separation of powers doctrine is intended to serve." (*Superior Court v. County of Mendocino* (1996) 13 Cal.4th 45, 52-53 [51 Cal.Rptr.2d 837, 913 P.2d 1046].)

Thus, with regard to statutory enactments affecting judicial roles, the Legislature "does not necessarily violate the separation of powers doctrine whenever it legislates with regard to an inherent judicial power or function. (*Superior Court v. County of Mendocino[, supra,*] 13 Cal.4th [at p.] 57.)" (*Obrien v. Jones* (2000) 23 Cal.4th 40, 48 [96 Cal.Rptr.2d 205, 999 P.2d 95]; *People v. Bunn, supra*, 27 Cal.4th at p. 16.) As long as such enactments do not defeat or materially impair the exercise of those functions, the Legislature may "regulate, within reasonable limits, the practices and procedures by which judicial matters are to be resolved." (*People v. Bunn, supra*, 27 Cal.4th at p. 23; *Superior Court v. County of Mendocino, supra*, 13 Cal.4th at p. 58.)

The tension between the Legislature's role in defining social policy and the judiciary's role in resolving matters before it is apparent in judicial efforts to reconcile section 1008, subdivision (e), with article III, section 3. On the one hand, " 'the [L]egislature may put reasonable restrictions upon constitutional functions of the courts *provided they do not defeat or materially impair the exercise of those functions.*' " (*Superior Court v. County of*

*Mendocino, supra,* 13 Cal.4th at p. 58.) On the other hand, "the separation of powers doctrine prohibits the Legislature 'from arrogating to itself core functions of the executive or judicial branch.'" (*People v. Bunn, supra,* 27 Cal.4th at p. 16, quoting *Carmel Valley Fire Protection Dist. v. State of California* (2001) 25 Cal.4th 287, 298 [105 Cal.Rptr.2d 636, 20 P.3d 533].) Just as the courts may not encroach upon the Legislature's function to define social policy through its enactments, the Legislature may not materially impair the essential duty of the courts to resolve specific controversies and regulate the litigation "to ensure the orderly and effective administration of justice." (*Kollander Construction, Inc. v. Superior Court, supra,* 98 Cal.App.4th at p. 312; *Case v. Lazben Financial Co., supra,* 99 Cal.App.4th at p. 184; *People v. Bunn, supra,* 27 Cal.4th at p. 15.)

We agree with those courts that have found the jurisdictional limitation of section 1008, subdivision (e) to constitute an impermissible interference with the core functions of the judiciary. "The inability to correct an error prior to trial and appeal is '"a serious impediment to a fair and speedy disposition of causes."'" (*Kollander Construction, Inc. v. Superior Court, supra,* 98 Cal.App.4th at p. 312; cf. *People v. Castello* (1998) 65 Cal.App.4th 1242, 1249 [77 Cal.Rptr.2d 314] ["Miscarriage of justice results where a court is unable to correct its own perceived legal errors"].) To deprive a court of jurisdiction to reconsider its interim rulings would, in our view, create a significant impediment to a court's ability to reach a fair and expeditious resolution of the issues before it.

Furthermore, we do not subscribe to the intermediate view that reconsideration is permitted only if it is made upon the court's own motion. (See, e.g., *Darling, Hall & Rae v. Kritt, supra,* 75 Cal.App.4th at p. 1157; *Case v. Lazben Financial Co., supra,* 99 Cal.App.4th at p. 185.) "While we agree with [the Second District,] Division Seven[,] that judicial resources would be wasted if the court could not review and change its interim rulings, we do not see how the manner of bringing erroneous rulings to the court's attention would in any way mitigate that waste. If section 1008 can be said to create an unreasonable impediment to the orderly and effective administration of justice, it can make no difference whether the error is brought to the attention of the court by the parties or by the insight of the judge alone." (*Kollander Construction, Inc. v. Superior Court, supra,* 98 Cal.App.4th at p. 312.) The *Remsen* court observed, "Whether the trial judge has an unprovoked flash of understanding in the middle of the night or is prompted to rethink an issue by the stimulus of a motion is 'constitutionally immaterial' to the limitation on the power of the Legislature to regulate the judiciary." (*Remsen v. Lavacot, supra,* 87 Cal.App.4th at p. 427, quoting Miller & Horton, *About Face* (Mar. 2000) 23 L.A. Law. 43, 49.)

Nevertheless, we are mindful of the "long-established policy [that] obliges us not to 'reach out and unnecessarily pronounce upon the constitutionality of any duly enacted statute.' [Citation.]" (*Kollander Construction, Inc. v. Superior Court, supra*, 98 Cal.App.4th at p. 314.) Some courts have accordingly considered whether section 1008 may be either construed or reformed to preserve its constitutionality. One court has suggested in dicta that the jurisdictional statement of subdivision (e) be read as directory only, on the principle that statutes should be interpreted to preserve their constitutionality. (*People v. Castello, supra*, 65 Cal.App.4th at p. 1249.) The *Kollander* court, on the other hand, regarded this solution as a judicial rewriting of the statute "in defiance of express policy judgments clearly articulated by the Legislature," and thus a violation of the separation of powers doctrine. (98 Cal.App.4th at pp. 313-314.)

We agree with the *Kollander* court that the statute cannot be construed as directory only; section 1008, subdivision (e) makes absolutely clear the intent that the court's power to hear successive motions be restricted to those that comply with section 1008, subdivisions (a) and (b). Yet we believe that reformation is a viable alternative to declaring the provision unconstitutional. ■ "Under established decisions of this court and the United States Supreme Court, a reviewing court may, in appropriate circumstances, and consistently with the separation of powers doctrine, reform a statute to conform it to constitutional requirements in lieu of simply declaring it unconstitutional and unenforceable. The guiding principle is consistency with the Legislature's . . . intent: [A] court may reform a statute to satisfy constitutional requirements if it can conclude with confidence that (i) it is possible to reform the statute in a manner that closely effectuates policy judgments clearly articulated by the enacting body, and (ii) the enacting body would have preferred such a reformed version of the statute to invalidation of the statute." (*Kopp v. Fair Pol. Practices Com.* (1995) 11 Cal.4th 607, 615 [47 Cal.Rptr.2d 108, 905 P.2d 1248].)

■ To so reform section 1008 does not defeat the purpose of the statute, but rather promotes the Legislature's express goal of discouraging repetitious litigation. "Section 1008 is designed to conserve the court's resources by constraining litigants who would attempt to bring the same motion over and over. On the other hand, these same judicial resources would be wasted if the court could not . . . review and change its interim rulings." (*Darling, Hall & Rae v. Kritt, supra*, 75 Cal.App.4th at p. 1157; accord, *Remsen v. Lavacot, supra*, 87 Cal.App.4th 421, 426.) In this case, for example, if we were to hold that Judge Rushing lacked jurisdiction to reconsider the summary judgment ruling, the court could be subjected to any

number of motions for judgment in various forms before, during, and after trial. By reconsidering the interim ruling at this early stage, Judge Rushing obviated not only further litigation over the issue before him, but an unnecessary trial and appeal.

We thus conclude that Judge Rushing properly exercised his constitutionally derived authority to reconsider the prior interim ruling and correct an error of law on a dispositive issue, thereby expediting the resolution of the parties' dispute. ▮ We therefore proceed to the next question, whether the court correctly ruled that the Sureties were entitled to judgment as a matter of law.

2. *Summary Judgment*

a. *Standard and Scope of Review*

▮ Summary judgment is proper when there is no triable issue of material fact and the moving party is entitled to judgment as a matter of law. (§ 437c, subd. (c).) In reviewing an order granting summary judgment, we exercise our independent judgment, applying the same analysis as the trial court. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 860 [107 Cal.Rptr.2d 841, 24 P.3d 493]; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383 [87 Cal.Rptr.2d 453, 981 P.2d 79].)

A defendant making the motion has the initial burden of showing that one or more elements of each cause of action cannot be established or that there is a complete defense to the action. (§ 437c, subd. (p)(2); *Aguilar v. Atlantic Richfield Co., supra,* 25 Cal.4th at pp. 853-854.) The defendant can meet this burden by affirmatively showing that "the plaintiff does not possess, and cannot reasonably obtain, needed evidence." (*Aguilar v. Atlantic Richfield Co., supra*, 25 Cal.4th at p. 854.)

If the defendant fails to meet this initial burden, it is unnecessary to examine the plaintiff's opposing evidence; the motion must be denied. (*Scheiding v. Dinwiddie Construction Co.* (1999) 69 Cal.App.4th 64, 71-72 [81 Cal.Rptr.2d 360]; accord, *Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768 [107 Cal.Rptr.2d 617, 23 P.3d 1143]; *Villa v. McFerren* (1995) 35 Cal.App.4th 733, 747 [41 Cal.Rptr.2d 719].) However, if the defendant makes a prima facie showing that justifies a judgment in the defendant's favor, the burden then shifts to the plaintiff to make a prima facie showing that there exists a triable material issue of fact. In meeting this obligation, the plaintiff may not rely on the mere allegations of its pleadings, but must "set forth the specific facts showing that a triable issue of material

fact exists as to that cause of action . . . ." (§ 437c, subd. (p)(2); *Merrill v. Navegar, Inc.* (2001) 26 Cal.4th 465, 476-477 [110 Cal.Rptr.2d 370, 28 P.3d 116].)

Because it is the pleadings that define the issues addressed in a summary judgment proceeding, we first examine the allegations of the complaint that pertain to the Sureties. The 10th cause of action is directed at the payment bond issued to Blount. The terms of that bond entitled Scott, as "claimant," to sue the Sureties to the extent that Blount, the named principal, failed to pay the claimant. If Blount did make payment to the claimant for all labor and materials required for the claimant's performance, then "this obligation" would be void. In the complaint Scott asserted the right to payment from the Sureties for the entire amount that Blount had failed to pay, along with attorney fees under Civil Code section 3250. Scott specifically asserted that the Sureties were jointly and severally liable to Scott for at least $4,394,407 plus interest. Scott also accused the Sureties of bad faith, seeking $4 million in punitive damages for the Sureties' failure to respond to its demand for payment.[10]

b. *The Sureties' Showing*

(i) *Damages*

In their summary judgment motion the Sureties addressed the claims for both damages and attorney fees. Recounting the procedural history of the case in their statement of undisputed facts, they noted that Blount's liability had been fully determined at the 1993 trial. Because Blount no longer owed Scott any money, the Sureties likewise were absolved of any further obligation on the payment bond. Scott, however, noted that this was a "public works payment bond" and not a private bond. Consequently, the Sureties' liability was "primary, completely independent of Blount['s]." Thus, Scott argued, it was entitled to recover *all* of its uncompensated labor and materials, including the work it had contributed as a result of RDA's breach of its obligations to Blount.

On appeal, the parties adhere to these positions. Because the essential facts regarding damages are undisputed, we confront only a question of law—namely, the effect of a plaintiff's recovery against the principal on the liability of the surety to the plaintiff.

---

[10]The allegation of bad faith was not addressed in the proceedings below and will not be discussed in this opinion.

Civil Code section 2809[11] is the primary statutory authority on which the Sureties rely. This provision states: "The obligation of a surety must be neither larger in amount nor in other respects more burdensome than that of the principal; and if in its terms it exceeds it, it is reducible in proportion to the principal obligation." Section 2810, while creating an exception to nonliability for the personal disability of the principal, nonetheless affirms that the surety is not liable if the principal's liability ends after execution of the contract. And section 2839 exonerates a surety upon "[p]erformance of the principal obligation, or an offer of such performance, duly made as provided in this code."

Scott contends that these sections are inapposite because this was a public works project governed by sections 3247 to 3250. These provisions, in Scott's view, are part of a "special statutory scheme" which prevails over the general surety provisions contained in sections 2806 to 2810. Scott cites numerous cases in which the scope of a surety's liability has been held not to depend on the contract between principal and claimant. None of these cases, however, holds that the public works provisions of section 3247 et seq. displace the general surety principles expressed in sections 2787 to 2839. None contravenes the general rule that a surety's liability is commensurate with that of the principal. (See, e.g., *U. S. Leasing Corp. v. duPont* (1968) 69 Cal.2d 275, 289-290 [70 Cal.Rptr. 393, 444 P.2d 65]; cf. *National Technical Systems v. Superior Court* (2002) 97 Cal.App.4th 415 [118 Cal.Rptr.2d 465] [applying § 2808 to surety liability in city project].) In each case the obligee sought to enforce the obligation of the surety where the debt incurred by the principal remained unpaid.

In *Powers Regulator Co. v. Seaboard Surety Co.* (1962) 204 Cal.App.2d 338, 345 [22 Cal.Rptr. 373], for example, a subcontractor failed to pay a sub-subcontractor. The appellate court held that a bond issued to the general contractor is a "primary and direct obligation" even to sub-subcontractors, regardless of the original contract terms. Thus, although the plaintiff could not proceed against the general contractor (with whom the plaintiff had no contractual relationship), the surety's obligation to the plaintiff was "not derived from the terms of any contract." (*Id.* at p. 355.) In so holding, the court relied on *Los Angeles S. Co. v. National S. Co.* (1918) 178 Cal. 247 [173 P. 79]. There the plaintiff sued the surety to recover the value of labor and materials furnished in a street improvement project, where the time for completing the work had expired under the construction contract. The Supreme Court explained that the surety's obligation did not "depend upon the validity of the contract or the faithful performance thereof by the

---

[11]All further statutory references are to the Civil Code unless otherwise specified.

contractor. It exists independently of such facts. The covenant is that *in case the principal fails* . . . in his obligations . . . to pay for materials furnished in doing the work *described in his contract* with the city, the surety will pay them." (*Id.* at p. 250, first italics added.)[12]

In *McCormick Saeltzer Co. v. Haidlen* (1931) 119 Cal.App. 96 [6 P.2d 255], the surety was held to be liable on a labor and materials bond issued in connection with a state highway construction project. After the general contractor became bankrupt, the surety took over the project, but it was unable to escape liability for *unpaid* amounts attributable to the period in which the contractor was in charge of the work. Similarly, the subcontractor in *Cooley v. Freeman* (1928) 204 Cal. 59 [266 P. 545] had not been paid for hauling material along a highway under construction.

In *Pneucrete Corp. v. U.S. Fid. & G. Co.* (1935) 7 Cal.App.2d 733, 738 [46 P.2d 1000], the court noted that a bond issued under the Public Works Act provides a remedy "separate and distinct" from the obligation of the contractor. The court did describe the bond provision as providing "an additional or cumulative remedy." (*Id.* at p. 737.) However, the court did not apply such a remedy as an *addition* to the satisfaction of the principal's obligation; the scenario the court confronted was the failure of the contractor to pay for his rental of equipment from the plaintiff.

Likewise, in *Walt Rankin & Associates, Inc. v. City of Murrieta* (2000) 84 Cal.App.4th 605, 625 [101 Cal.Rptr.2d 48], the court characterized public works payment bonds under section 3247 as "intended to provide additional protection against defaulting general contractors." The general contractor in

---

[12]Courts have also been reluctant to exempt sureties from payments from which their principals have been released. In *Washington Internat. Ins. Co. v. Superior Court* (1998) 62 Cal.App.4th 981 [73 Cal.Rptr.2d 282], the general contractor had failed to make timely progress payments to the subcontractor, and the subcontractor claimed the right to a statutory 2 percent interest penalty. (Pub. Contract Code, § 10262.5.) The appellate court noted that statutory provisions governing public works payment bonds are incorporated into the terms of the bond. Thus, the court rejected the surety's assertion that it was required to pay only for labor and materials used in the project and not the interest penalty. The Supreme Court rejected the surety's argument that its liability should be measured by the contract between the public entity and the general contractor. In *Bowman v. Santa Clara County* (1957) 153 Cal.App.2d 707 [315 P.2d 67], the First District rejected the surety's argument that it was released from its obligation toward the plaintiff subcontractor when the terms of the arrangement between the plaintiff and the principals had changed during the contract period. In *Department of Industrial Relations v. Seaboard Surety Co.* (1996) 50 Cal.App.4th 1501 [58 Cal.Rptr.2d 532], the surety's obligation was not extinguished even though the action against the principal was barred by the statute of limitations under the Labor Code.

that case had failed to pay the plaintiff for the plaintiff's installation of playground equipment in a city park. The court did not suggest that the "additional protection" would come into play if the general contractor were *not* in default.

These cases clearly do not support Scott's demand for payment by the Sureties because the underlying premise of their holdings—the default of the principal—is not met here. After a lengthy trial Judge Kroninger found that Blount was responsible for $442,054 of Scott's $2 million damages claim against Blount. (See *Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1107.) Blount has satisfied this obligation. There is no legal basis for Scott's pursuit of damages attributable to the negligence of RDA, with whom Scott settled before the trial. Blount, not RDA, was the Sureties' principal on the payment bond. Scott's perseverance in claiming $772,940.12 from Blount's sureties can only be interpreted as an effort to recover in excess of the amount to which it was entitled, in disregard of Judge Kroninger's factual findings and the law of the case. Thus, nothing is left for Scott to recover unless it is entitled to attorney fees. We next turn to this question.

### (ii) *Attorney Fees*

The Sureties also disputed Scott's claim for the attorney fees it had incurred in pursuing the litigation. In the Sureties' view, the settlement offer from Blount foreclosed recovery of attorney fees by Scott, because the proposed payment had been conditioned upon Scott's dismissal of the action as to both Blount and its sureties. Consequently, they argued, that offer "plainly inures to the sureties' benefit, precluding Scott's recovery of post-[section] 998 fees from the sureties."

In denying the Sureties' summary judgment motion, Judge Kroninger found a triable factual issue as to whether the Sureties were included in Blount's section 998 offer. Relying on *R.P. Richards, supra*, 83 Cal.App.4th 146, the court noted that there was no evidence that the Sureties had consented to Blount's settlement; they were named in the offer "in connection with being dismissed" but had not agreed to have judgment entered against them. If Scott had accepted an exorbitant offer made by Blount, the Sureties would certainly have contested liability upon Blount's subsequent default. If there had been no offer at all, Scott would have received attorney fees and costs as well as its damages. In the court's view, since the Sureties were not a party to the proposed settlement, they were not entitled to benefit from Scott's obligation to pay those postoffer fees. Accordingly, Judge

Kroninger ruled that Scott was entitled to a trial against the Sureties to prove its "attorney fees at the trial level which were not reimbursed."[13]

Judge Rushing disagreed. He found the issue of whether the Sureties had consented to Blount's settlement offer to be immaterial, because Blount "ha[d] been adjudicated to have no relevant outstanding obligations to Scott."

Under section 3248, every public works payment bond must provide that if a general contractor fails to pay a subcontractor, the sureties on the bond will pay amounts owed to the subcontractor "and also, in case suit is brought upon the bond, a reasonable attorney's fee, to be fixed by the court." Section 3250 provides, in relevant part, that an action on a payment bond "may be maintained separately from and without the filing of an action against the public entity by whom the contract was awarded or any officer thereof. In any action, the court shall award to the prevailing party a reasonable attorney's fee, to be taxed as costs."

In this case Scott was the prevailing party in the litigation against Blount. (*Scott Co. v. Blount, Inc., supra*, 20 Cal.4th at p. 1109.) However, Blount was relieved of the duty to pay the attorney fees Scott accrued when Scott rejected Blount's section 998 offer and failed to achieve a more favorable outcome. Relying on the same rationale as for Scott's damages recovery— that their liability is coextensive with Blount's—the Sureties argue that Scott's attorney fees have already been "paid in full" by Blount. "Thus, the extent of Scott's entitlement to attorneys' fees for the trial is now the law of this case, and there is no basis for any further liability on the part of the Sureties."

The Sureties' position is initially appealing in light of our conclusion that its liability for damages terminated upon Blount's payment of the $442,054 award. However, Scott's postoffer attorney fees have not "already been paid" by Blount; indeed, Scott did not recover any such fees and instead was ordered to pay Blount's postoffer fees. Were the Sureties relieved of their statutory duty to pay attorney fees when Blount was relieved of its obligation? "The fee obligation under Civil Code section 3250 is a separate and primary obligation of the party (surety or claimant) who does not prevail in the action on the bond." (*Liton Gen. Engineering Contractor, Inc. v. United Pacific Insurance, supra*, 16 Cal.App.4th 577, 592 (*Liton*).) Even when the

---

[13]The judge was doubtful that Scott would recover RDA damages. He also suggested that obtaining $442,000 from the Sureties as well as postoffer fees would amount to double compensation.

principal has paid the damages owed to the plaintiff, the surety may still be liable for the accrued interest and costs, including attorney fees. (*Granite Rock Co. v. Freeman* (1928) 93 Cal.App. 507 [269 P. 668].)

*Liton* is instructive in evaluating the respective rights and duties of claimants, principals, and sureties. In that case the plaintiff subcontractor sued the general contractor for breach of contract and the surety for attorney fees under a public works payment bond. Over the plaintiff's objection, the trial court stayed the action pending arbitration of the dispute between the plaintiff and the general contractor. The arbitrator awarded the plaintiff the full amount of its claim and ordered each party to bear its own costs and attorney fees.[14] When the action resumed against the surety, the plaintiff successfully moved for summary judgment.

In upholding the judgment, the First District, Division Two, held that the surety was required to pay the attorney fees the plaintiff had incurred in the arbitration, even though the principal was not liable for those fees, and even though the surety had not participated in the arbitration. This liability was triggered by the contractor's initial refusal to pay and continued through the arbitration. (*Liton, supra,* 16 Cal.App.4th at pp. 584, 591.) The court noted that under section 3226 a claimant's recovery depends solely upon the fact that the claimant " 'has not been paid the full amount of his claim.' "[15] (*Liton,* at p. 591.) The specific mandate of section 3250 is not subordinate to the more general statutes making the surety's liability commensurate with that of the principal. Accordingly, the surety's section 3250 liability for the plaintiff's attorney fees was not derivative of any fee liability of the general contractor, but was "separate and primary." (*Liton,* at p. 592.)

Because section 3250 imposes an independent statutory obligation on the Sureties to pay a successful claimant's attorney fees, we believe that Blount's discharge under section 998 did not necessarily exonerate the Sureties. As Judge Kroninger observed, there was a disputed issue of fact as

---

[14]The subcontract between the plaintiff and the general contractor had specified that each party would bear its own attorney fees in connection with any arbitration. The court noted that this provision merely reflected the general rule stated in Code of Civil Procedure section 1021, and was not designed to relieve the surety of its statutory liability for fees. (*Liton, supra,* 16 Cal.App.4th at p. 589.)

[15]Section 3226 states: "Any bond given pursuant to the provisions of this title will be construed most strongly against the surety and in favor of all persons for whose benefit such bond is given, and under no circumstances shall a surety be released from liability to those for whose benefit such bond has been given, by reason of any breach of contract between the owner and original contractor or on the part of any obligee named in such bond, but the sole conditions of recovery shall be that claimant is a person described in Section 3110, 3111, or 3112, and has not been paid the full amount of his claim."

to whether the Sureties had participated in Blount's settlement offer or were even encompassed in the offer.[16] If they were not a party to the $900,000 offer, they were not released by Scott's failure to obtain a more favorable recovery against Blount. The Sureties thus failed to meet their burden to present either a complete defense or an affirmative showing that Scott would be unable to establish its claim.

It is unnecessary to discuss the effect of section 2822 or *R.P. Richards*, the case on which Judge Kroninger relied in explaining his denial of the Sureties' summary judgment motion. Section 2822 describes the effect on a nonconsenting surety of an agreement by the creditor to accept less than the principal owes.[17] In *R.P. Richards* the court applied the exoneration provisions of section 2819 to a settlement between the plaintiff subcontractor and a contractor.[18] As the Sureties themselves emphasize, these situations are not present here. We thus need not address the hypothetical question of the Sureties' liability if Blount had accepted Scott's offer and later defaulted, because Scott did not accept and there was no default. Only the reach of section 998 in these circumstances is of concern here.

The Sureties argue that to compel them to pay fees for which Blount was not liable would defeat the purpose of section 998, to promote settlement. They raise a valid concern. However, the mandate of section 3250 also serves an important objective: to further the "strong policy . . . favoring mechanics, laborers and materialmen." (*Liton, supra,* 16 Cal.App.4th at

---

[16]The offer stated the following: "Pursuant to section 998 of the Code of Civil Procedure, defendant and cross-complainant Blount, Inc. ('Blount') hereby offers to have judgment entered against it and in favor of [Scott] in the sum of $900,000 (nine hundred thousand dollars), with each party to bear its own costs and attorneys' fees and on the additional condition that Scott dismisses with prejudice its first amended complaint in this action against any and all sureties and insurers of Blount."

[17]This statute provides: "(a) The acceptance, by a creditor, of anything in partial satisfaction of an obligation, reduces the obligation of a surety thereof, in the same measure as that of the principal, but does not otherwise affect it. However, if the surety is liable upon only a portion of an obligation and the principal provides partial satisfaction of the obligation, the principal may designate the portion of the obligation that is to be satisfied. [¶] (b) For purposes of this section and Section 2819, an agreement by a creditor to accept from the principal debtor a sum less than the balance owed on the original obligation, without the prior consent of the surety and without any other change to the underlying agreement between the creditor and principal debtor, shall not exonerate the surety for the lesser sum agreed upon by the creditor and principal debtor."

[18]Section 2819 provides: "A surety is exonerated, except so far as he or she may be indemnified by the principal, if by any act of the creditor, without the consent of the surety the original obligation of the principal is altered in any respect, or the remedies or rights of the creditor against the principal, in respect thereto, [are] in any way impaired or suspended. However, nothing in this section shall be construed to supersede subdivision (b) of Section 2822."

p. 582.) "[T]o conclude that a surety may escape the statutory duty to pay fees in an action on a payment bond when the principal finally pays the amount due to the subcontractor, following protracted and expensive litigation-related proceedings, would . . . subvert the fee[-]shifting statutes. Such result would make the statutory mandate dependent upon (1) whether the principal was contractually liable to the subcontractor for fees; and (2) whether the principal paid the underlying debt promptly following judgment, regardless of the time, energy and money expended by the subcontractor in obtaining judgment in its action on the bond. To condition application of section 3250 upon either occurrence as a practical matter would vitiate the strong public policy that informs the public works fee[-]shifting statutes." (*Id.* at p. 592.) If a settlement offer proposed to allow judgment to be entered against both principal *and* surety, the settlement-promoting objectives of section 998 as well as the policy favoring compensation of subcontractors would be served.

We thus conclude that the matter must be remanded for trial or other disposition of the 10th cause of action. Judge Kroninger was confident that the parties could resolve the issue of the Sureties' participation in the offer by documentary proof. Consequently, he "envision[ed] that Scott can, in effect, present its entire case really before we get to the trial." To that end, nothing precludes a new motion for summary judgment supported by adequate evidence that the Sureties "consented to the offer and meant to be parties [to it] and be bound by it," as they asserted at the hearing before Judge Kroninger.

### Disposition

The judgment is reversed. In the interests of justice, the parties shall bear their own costs on appeal.

Premo, Acting P. J., and Bamattre-Manoukian, J., concurred.

Respondents' petition for review by the Supreme Court was denied July 16, 2003. Brown, J., did not participate therein.