[No. B165006. Second Dist., Div. Four. Oct. 15, 2004.]

ROYAL THRIFT AND LOAN COMPANY, Cross-complainant and Appellant, v.
COUNTY ESCROW, INC., et al., Cross-defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of part II of the Discussion.

## COUNSEL

Martin & McCormick, John D. Martin and Kathy J. McCormick for Cross-defendants and Appellants.

Cunningham & Treadwell, James H. Treadwell and Ryan L. Arnett for Cross-complainant and Appellant.

## OPINION

**CURRY, J.**—In the underlying action, Arthur Paul Jones and Rosalie K. Jones filed a complaint against Michelle Kramer, County Escrow, Inc. (County Escrow), and Royal Thrift and Loan Company (Royal Thrift), among others, alleging negligence and fraud in connection with a loan secured by real property that they owned, and seeking quiet title. Royal Thrift cross-complained, seeking quiet title to the property, alleging, inter alia, negligence and fraud against Kramer and County Escrow, and requesting recovery on a bond issued by Star Insurance Company (Star Insurance) on behalf of Kramer and County Escrow. Kramer, County Escrow, and Star Insurance also cross-complained for indemnity.

The judgment following trial determined that Royal Thrift had the right to foreclose upon a deed of trust secured by the Joneses' property, and reserved the trial court's jurisdiction to assess Royal Thrift's damages (if any), when it exercised this right. After Royal Thrift conducted the foreclosure sale, the trial court entered a modified judgment, awarding Royal Thrift damages against Kramer and County Escrow, and allowing it to recover from Star Insurance on its bond.

Kramer, County Escrow, and Star Insurance appeal from the modified judgment, and Royal Thrift cross-appeals from the trial court's denial of its request for an award for attorney fees. We affirm the judgment in its entirety.

## STATEMENT OF THE CASE

This is the second time this case has come before us. We summarize the history culminating in our first decision before describing the facts pertinent to the present appeal.

### A. *Complaints, Trial, and Judgment Following Trial*

On October 23, 1997, the Joneses filed their complaint against Kramer, County Escrow, and Royal Thrift, as well as Jeff Jones (the Joneses' adult son), Sam Favata, Ruben Sanchez, and other parties. The complaint contained claims for declaratory relief, quiet title, conspiracy, negligence, fraud, and forgery. Royal Thrift was named as a defendant in the claims for declaratory relief, quiet title, conspiracy, and negligence.

The complaint alleged the following facts. In June 1995, Jeff Jones, Favata, and Sanchez arranged for a loan secured by the Joneses' residence, without the Joneses' knowledge or consent. Escrow was opened at County Escrow, and a promissory note and a deed of trust bearing the Joneses' forged signatures were deposited with County Escrow. Kramer notarized the deed of trust and other documents. County Escrow accepted the documents on behalf of Royal Thrift, the lender, and distributed the escrow funds, which were delivered to Jeff Jones, Favata, and Sanchez, rather than to the Joneses. Royal Thrift later asserted that the loan was in default, and that it was entitled to foreclose on the property.

County Escrow and Kramer cross-complained for indemnity and declaratory relief against Arthur Jones, Jeff Jones, Favata, Sanchez, and others. Subsequently, Royal Thrift filed a first amended cross-complaint against the Joneses, Kramer, County Escrow, Star Insurance, Jeff Jones, Favata, Sanchez, and others.

On April 6, 1999, Kramer and County Escrow filed separate motions for summary judgment or adjudication on the Joneses' claims against them. The trial court granted summary adjudication with respect to all of the Joneses' claims against them, with the exception of a claim for fraud.

On May 24, 1999, Royal Thrift filed a motion for summary adjudication, contending that the Joneses' claims against it for declaratory relief and quiet title were meritless because the Joneses had ratified the loan, and that Royal

Thrift should prevail on its cross-claims for declaratory relief and quiet title against the Joneses. On May 26, 1999, Kramer and County Escrow filed separate motions seeking summary judgment on the Joneses' remaining fraud claim against them. Following a hearing on June 23, 1999, the trial court granted all these motions in their entirety.

A bench trial on the unresolved claims and cross-claims began on February 7, 2000. Evidence was presented that Arthur Jones and Kramer were aware that the loan was fraudulent as early as May 1995, and that the Joneses refrained from challenging it to protect their son. Evidence was also presented that Royal Thrift began issuing default notices in September 1996, and that it was unaware of any irregularity regarding the loan until mid-1997.

The trial court's statement of decision denied Royal Thrift's request for attorney fees as an item of damages. Subsequently, the trial court filed its judgment following trial on May 3, 2000. Judgment was entered in favor of the Joneses on their claims against Jeff Jones, Favata, Sanchez, and others, and they were awarded $192,039.74 in damages.

The judgment also declared that Royal Thrift held a valid first trust deed on the Joneses' residence. Judgment was entered in favor of Royal Thrift and against the Joneses on their claims and cross-claims for declaratory relief and quiet title because the Joneses had "by their conduct, after having knowledge of the fraud and forgery, ratified the loan . . . ." In addition, judgment was entered in favor of Royal Thrift on its cross-claims for (1) negligence against Kramer, (2) negligence and recovery on a bond against Kramer, County Escrow, and Star Insurance, and (3) fraud against Kramer, County Escrow, Jeff Jones, Favata, Sanchez, and other parties.

The judgment further stated: "Royal Thrift has suffered no present damages for nonpayment of the loan as it retains the right to foreclose upon the above-referenced Deed of Trust secured by the subject property. In the event that the Deed of Trust is subsequently declared void by a Court of competent jurisdiction, or if [Royal Thrift] were to cancel the instrument, then Royal Thrift will have been damaged by the Cross-Defendants found liable to it in the sum of $192,039.74, plus any and all accrued interest and arrearages from and after trial. If the foreclosure sale fails to fully compensate [Royal Thrift] for the unpaid balance on the promissory note, it then will have incurred damages for the difference. The Court specifically retains jurisdiction over the entire issue of [Royal Thrift's] damages pending the outcome of the foreclosure sale of the subject property."

On May 18, 2000, the Joneses filed a motion for a new trial, which the trial court denied in its entirety.

### B. *First Appeal*

The Joneses appealed from the orders granting summary adjudication and judgment, as well as from the judgment following trial and the denial of their motion for a new trial. Kramer, County Escrow, and Star Insurance also noticed a cross-appeal from the judgment following trial. In addition, Royal Thrift noticed a cross-appeal from the denial of its request for attorney fees.

We concluded that aside from the Joneses' appeal with respect to their claims against Royal Thrift, the appeal and cross-appeals were premature, given that the trial court had reserved jurisdiction over the issue of Royal Thrift's damages. (*Jones v. Royal Thrift & Loan Company* (Sept. 21, 2001, B142843) [nonpub. opn.].) We dismissed the appeal and cross-appeals, with the exception of the Joneses' appeal against Royal Thrift, and otherwise affirmed the judgment in favor of Royal Thrift on the claims and cross-claims between the Joneses and Royal Thrift. (*Ibid.*)

### C. *Foreclosure Sale and Modified Judgment*

On January 31, 2002, a foreclosure sale was held at which Royal Thrift bought the property for $139,000. On May 9, 2002, Royal Thrift filed a motion for a modified judgment, contending that it was entitled to $75,891.95 in damages, plus accrued interest from the date of the foreclosure sale.

On October 7, 2002, the trial court granted the motion in part, awarding Royal Thrift $53,039.74 in damages plus accrued interest. On December 3, 2002, it entered a modified judgment, awarding Royal Thrift $56,575.72 in damages and interest against Kramer and County Escrow, and allowing it to recover $50,000 from Star Insurance on its bond.

Kramer, County Escrow, and Star Insurance have appealed from this judgment. Royal Thrift has also cross-appealed from it to the extent that it denies Royal Thrift an award of attorney fees.

## DISCUSSION

### I.

Appellants Kramer, County Escrow, and Star Insurance contend that (1) the trial court erred in granting the motion for a modified judgment. In addition, Star Insurance contends that (2) the trial court improperly denied it leave to amend its answer, and (3) a provision in its bond bars Royal Thrift's action against it. None of these contentions has merit.

A. *Modified Judgment*

■ The crux of appellants' challenge to the modified judgment is that the trial court ignored fatal irregularities in Royal Thrift's nonjudicial foreclosure sale. Such "foreclosure sales are governed by a 'comprehensive' statutory scheme. This scheme, which is found in Civil Code sections 2924 through 2924k, evidences a legislative intent that a sale which is properly conducted 'constitutes a final adjudication of the rights of the borrower and lender.' [Citation.]" (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc.* (2001) 85 Cal.App.4th 1279, 1283–1284 [102 Cal.Rptr.2d 711], fn. omitted.)

The scheme can be summarized as follows. "Upon default by the trustor, the beneficiary may declare a default and proceed with a nonjudicial foreclosure sale. (Civ. Code, § 2924 . . . .) The foreclosure process is commenced by the recording of a notice of default and election to sell by the trustee. (Civ. Code, § 2924 . . . .) After the notice of default is recorded, the trustee must wait three calendar months before proceeding with the sale. (Civ. Code, § 2924, subd. (b) . . . .) After the 3-month period has elapsed, a notice of sale must be published, posted and mailed 20 days before the sale and recorded 14 days before the sale. (Civ. Code, § 2924f . . . .) The trustee may postpone the sale at any time before the sale is completed. (Civ. Code, § 2924g, subd. (c)(1) . . . .) If the sale is postponed, the requisite notices must be given. (Civ. Code, § 2924g, subd. (d).) The conduct of the sale, including any postponements, is governed by Civil Code section 2924g. [Citation.] The property must be sold at public auction to the highest bidder. (Civ. Code, § 2924g, subd. (a) . . . .)" (*Moeller v. Lien* (1994) 25 Cal.App.4th 822, 830 [30 Cal.Rptr.2d 777].)

" 'As a general rule, there is a common law *rebuttable* presumption that a foreclosure sale has been conducted regularly and fairly.' [Citations.]" (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc., supra*, 85 Cal.App.4th at p. 1284.) Moreover, "[a]side from the common law presumption of validity discussed above . . . , Civil Code section 2924 contains a statutory presumption 'aris[ing] from the recital in the trustee's deed that all statutory requirements for notice of default and sale have been satisfied. This presumption is prima facie evidence of compliance and conclusive evidence of compliance in favor of a bona fide purchaser or encumbrancer.' [Citations.] Thus, once a deed reciting that all legal requirements have been satisfied has been transferred to a buyer at a foreclosure sale, the sale can be successfully attacked on the grounds of procedural irregularity *only if* the buyer is not a bona fide purchaser. [Citations.]" (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc., supra*, 85 Cal.App.4th at p. 1286.)

1. *Appellants' Standing*

At the outset of our inquiry, we address Royal Thrift's contention that appellants do not have standing to attack the foreclosure sale. As we explain below, appellants have standing to assert that Royal Thrift failed to mitigate its damages in connection with the sale, but not to request that the sale should be set aside.

██ Generally, only parties with an interest in a loan secured by real property or in the underlying property may try to set aside a nonjudicial foreclosure sale. (See *Munger v. Moore* (1970) 11 Cal.App.3d 1, 8–9 [89 Cal.Rptr. 323]; 2 Bernhardt, Cal. Mortgage and Deed of Trust Practice (3d ed. 2004) §§ 7.52–7.57, pp. 518–520.) Here, appellants have no such interest.[1]

Nonetheless, we conclude that appellants have limited standing to raise irregularities regarding the foreclosure proceedings under the doctrine of mitigation of damages, which applies to contract and tort claims. (*Green v. Smith* (1968) 261 Cal.App.2d 392, 396–397 [67 Cal.Rptr. 796]; 6 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 1382, pp. 851–852.) Before the trial court, appellants asserted that Royal Thrift had failed to mitigate its damages in connection with the foreclosure proceedings.

This doctrine's key elements are summarized in *Green v. Smith, supra,* 261 Cal.App.2d at pages 396–397: "A plaintiff cannot be compensated for damages which he could have avoided by reasonable effort or expenditure. [Citations.] . . . [¶] [However,] [t]he doctrine does not require the injured party to take measures which are unreasonable or impractical or which would involve expenditures disproportionate to the loss sought to be avoided or which may be beyond his financial means. [Citations.] . . . The standard by which the reasonableness of the injured party's efforts is to be measured is not as high as the standard required in other areas of law. [Citations.] It is sufficient if he acts reasonably and with due diligence, in good faith. [Citations.]"

In the present case, the interlocutory judgment following trial determined that Royal Thrift then had *no* damages due to its right to foreclose on the trust deed, and it recognized that Royal Thrift's damages could not be assessed until the trust deed was declared void or rescinded, or Royal Thrift exercised its foreclosure rights. It further provided that the trial court retained

---

[1] As we indicate below (see pt. A.3., *post*), the record before us supports a determination that Royal Thrift was a bona fide purchaser at the sale. We thus observe (without deciding the issue) that the recording of the deed following the sale would generally trigger a conclusive presumption in favor of Royal Thrift's title, regardless of irregularities in the sale. (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc., supra,* 85 Cal.App.4th at p. 1286.)

jurisdiction "over the *entire issue* of [Royal Thrift's] damages pending the outcome of the foreclosure sale of the subject property." (Italics added.)

In view of these determinations, Royal Thrift was under a continuing duty throughout the foreclosure proceedings to mitigate the damages for which appellants were liable. Appellants thus have standing to assert that Royal Thrift unreasonably impaired this sale, but only for the purpose of attacking the award of damages against them. We therefore turn to appellants' contentions on these matters.

## 2. *Excessive Postponements*

■ Appellants' first contention is that Royal Thrift improperly postponed the foreclosure sale more than three times, in contravention of Civil Code section 2924g, subdivision (c)(1). Under this provision, the sale trustee may in its discretion postpone the sale only three times, and absent special circumstances, further postponements require a new notice of sale.

■ The overarching issue is whether the foreclosure proceedings fell within an exception to the three-postponement limit. Subdivision (c)(2) of Civil Code section 2924g states that the trustee "*shall* postpone the sale . . . where stayed by operation of law" (italics added), and it further provides that any such postponement does not count towards the three-postponement limit.

Before the trial court, Royal Thrift argued that the first appeal stayed the sale by operation of law until January 11, 2002, when our decision in the first appeal became final, and thus the sale was postponed only *once* for the purpose of the three-postponement limit. The trial court apparently agreed. It noted that although no case had held that an appeal stayed the foreclosure sale, the "better practice" under the applicable statutes and circumstances was to stay the sale pending final resolution of issues concerning the title to the property. It also found insufficient evidence of any irregularity in the foreclosure proceedings after January 11, 2002. In our view, it did not err.

The record discloses the following sequence of events: On September 21, 2001, we issued our opinion in the first appeal, thereby affirming that Royal Thrift had a valid trust deed regarding the Joneses' property. On November 13, 2001, Royal Thrift directed the trustee under the deed to record a notice of sale setting the foreclosure sale for December 5, 2001. The Joneses then filed a petition for review. According to declarations from James Treadwell, Royal Thrift's counsel, and John Tonoyan, Royal Thrift's vice-president and chairman of the board, Treadwell recommended that the sale should be postponed until the Supreme Court ruled on this petition, and Tonoyan accepted these recommendations.

While this petition was pending, the sale was postponed three times at Royal Thrift's request to the following dates: December 12, 2001; December 19, 2001; and December 28, 2001. The sale was postponed a fourth time to January 8, 2002, by an agreement between the Joneses and Royal Thrift.

The petition for review was denied on January 3, 2002. According to Treadwell's declaration, he did not learn about this ruling until January 29, 2002. At Royal Thrift's request, the sale was postponed a fifth time to January 22, 2002.

Our remittitur issued on January 11, 2002. At Royal Thrift's request, the sale was postponed a sixth time to January 31, 2002, when it was finally conducted.

■ In light of this record, the key issue is whether the first appeal stayed foreclosure proceedings until January 11, 2002, due to the "automatic stay" rule. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 275, pp. 318–319.) Under Code of Civil Procedure section 916, subdivision (a), "the perfecting of an appeal stays proceedings in the trial court upon the judgment or order appealed from or upon the matters embraced therein or affected thereby, including enforcement of the judgment or order," unless the matter falls within enumerated exceptions. Accordingly, *if* the first appeal automatically stayed the foreclosure sale until the issuance of our remittitur, the trial court could have correctly determined that Royal Thrift postponed the sale only once before it occurred on January 31, 2002.

■ We begin by examining whether an automatic stay would bar the nonjudicial foreclosure sale at issue here. Generally, an automatic stay "prevents any further proceedings to enforce the judgment or order." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 228, at p. 285.) However, our research has not disclosed any case addressing whether a stay of this kind applies to nonjudicial foreclosure proceedings, which ordinarily do not involve judicial intervention. (*Homestead Savings v. Darmiento* (1991) 230 Cal.App.3d 424, 431–435 [281 Cal.Rptr. 367].)

We find guidance on this matter in *Stewart v. Whitmyre* (1961) 192 Cal.App.2d 327 [13 Cal.Rptr. 235]. In *Stewart*, the underlying dispute concerned whether a contract permitted a party to move a building to a nearby lot that she owned. (*Id.* at pp. 328–329.) The judgment confirmed her title to the building but forbade her to move it to her lot, and the trial court ordered her to move the building elsewhere within 10 days. (*Ibid.*) She filed an appeal and an appeal bond, and after the 10-day period elapsed, the opposing parties destroyed the building. (*Ibid.*) The court in *Stewart* held that

her filing of the bond triggered a stay of all proceedings to enforce the judgment, and that she had a claim for the destruction of her building. (*Id.* at p. 330.)

■ Although *Stewart* concerns a stay arising from an appeal bond, rather than an automatic stay, it implies that any appellate stay bars action to enforce the judgment, including nonjudicial or private action. Automatic stays thus halt a nonjudicial foreclosure sale, which is a statutorily authorized adjudication of rights under a trust deed. (*6 Angels, Inc. v. Stuart-Wright Mortgage, Inc., supra*, 85 Cal.App.4th at pp. 1283–1284.)

■ We turn to appellants' contention that no automatic stay was effective during the first appeal. Before the trial court, they argued that the judgment at issue in the first appeal fell within an exception to the automatic stay rule found in Code of Civil Procedure section 917.4. This exception applies to judgments that "direct[] the sale, conveyance or delivery of possession of real property which is in the possession or control of . . . the party ordered to sell, convey or deliver possession of the property . . . ." Appellants indicated that the Joneses never provided an undertaking or bond to stay proceedings, as required under Code of Civil Procedure section 917.4, and thus there was no legal impediment to the foreclosure sale.

Appellants had the burden of establishing that this exception governed the judgment in the first appeal. (*Barnes v. Chamberlain* (1983) 147 Cal.App.3d 762, 767 [195 Cal.Rptr. 417].) In our view, they did not carry this burden.[2] Because the judgment did not require a deficiency payment from the Joneses, the application of the exception hinges *solely* on whether an undertaking or bond was needed to cover the value of occupation and waste by the Joneses, in view of their right (if any) to possess the property during the first appeal. (9 Witkin, Cal. Procedure, *supra*, Appeal, §§ 249–250, at pp. 304–305.)

■ As Witkin explains, Code of Civil Procedure section 917.4 "does not apply to an appellant who is not in possession or control of the property. [¶] Thus, the bond covers value of occupation and waste, but a person not in possession does not occupy or commit waste. It also covers the 'suffering' of waste to be committed, so that one with the *right to possession*, who permits another to possess the property in subordination to his right, comes within its

---

[2] Royal Thrift contends that as a matter of law, the judgment against the Joneses fell outside the scope of Code of Civil Procedure section 917.4 because this judgment did not direct the foreclosure sale, but instead placed the sale at the election of Royal Thrift. We disagree. In some circumstances, this provision applies to judgments that accord the prevailing party an option to sell or convey the real property. (*Archer v. Miller* (1923) 192 Cal. 67, 68–69 [218 P. 410] [predecessor of Code Civ. Proc., § 917.4 governs judgment affirming party's option to buy real property].)

terms; but one with neither possession nor the right to possession is not required to give bond." (9 Witkin, Cal. Procedure, *supra*, Appeal, § 250, at pp. 304–305.)

 Whether the Joneses, as mortgagors, retained the right to possess the residence during the appeal depends on whether they had relinquished possession to Royal Thrift, the mortgagee. Mortgagors ordinarily have the right to possession. (9 Witkin, Cal. Procedure, *supra*, Appeal, § 250, at pp. 304–305.) Nonetheless, a mortgagee may obtain the right to possession through the mortgagor's consent, as demonstrated "by circumstances as well as by direct evidence of formal and declared acquiescence . . . ." (*Cameron v. Ah Quong* (1917) 175 Cal. 377, 384 [165 P. 961].)

Here, appellants did not present any evidence that the Joneses retained the right to possession during the appeal. Because they failed to establish that Code of Civil Procedure section 917.4 was applicable, the trial court correctly determined that Royal Thrift had properly postponed the foreclosure sale.

However, even if there were no stay, we do not see reversible error. For reasons that we have indicated (see pt. I.A.1., *ante*), our inquiry is *solely* whether Royal Thrift, in postponing the sale, "act[ed] reasonably and with due diligence, in good faith" under the doctrine of the mitigation of damages. (*Green v. Smith*, *supra*, 261 Cal.App.2d at p. 397.) The validity of Royal Thrift's title to the property following the sale is not in question before us.

 Mitigation of damages is a question of fact. (*Green v. Smith*, *supra*, 261 Cal.App.2d at p. 397.) Here, the trial court found that the "better practice" was to stay the foreclosure proceedings. To the extent that this finding bears on the mitigation of damages,[3] our review is limited to assessing whether there is substantial evidence that Royal Thrift acted reasonably in postponing the sale. (*Green v. Smith*, *supra*, 261 Cal.App.2d at p. 397.) On review for the existence of substantial evidence, our power as an appellate court "begins and ends with the determination as to whether, on the entire record, there is substantial evidence, contradicted or uncontradicted, which will support the determination [of the trier of fact] . . . ." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 873–874 [197 Cal.Rptr. 925], italics omitted.)

We conclude that the record supports such a determination. It indicates that Royal Thrift postponed the sale to ensure that there was a final judgment that

---

[3] In any event, when, as here, appellants fail to object to the trial court about the omission of express findings on a factual matter, we will imply the findings necessary to the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133–1134 [275 Cal.Rptr. 797, 800 P.2d 1227].)

the trust deed was valid, and as we have explained, the case authority in existence when Royal Thrift made this decision supports the proposition that the Joneses' appeal barred the foreclosure sale. Furthermore, as we elaborate below (see pt. I.A.3., *post*), substantial evidence supports the inference that Royal Thrift otherwise acted reasonably in connection with the proceedings.

In sum, appellants have failed to show reversible error arising from Royal Thrift's postponements of the foreclosure sale.

### 3. *Conduct of Sale*

Appellants' second contention is that Royal Thrift's conduct in connection with the foreclosure sale, taken as a whole, improperly depressed the price of the property. They argue that the record shows that Royal Thrift tried to suppress bidding on the property in a variety of ways, including the postponements. We disagree.

Appellants submitted declarations from Mike Karahalios and Attorneys Catrina M. Archuleta and William M. Aitken, who had monitored the underlying action on behalf of Star Insurance. Karahalios stated that he works as an agent for persons who buy properties at foreclosures, and has attended thousands of such sales. He appeared at the sale set for December 5, 2001, and was qualified as a bidder. Thereafter he was informed that the sale was postponed because the note upon which the foreclosure was based was forged, and Royal Thrift could not guarantee a good title to the property. Karahalios opined that Royal Thrift had no intention in holding the sale that day, citing the fact that buyers were qualified before the sale was postponed, and the disclosures about the uncertain title. He also opined that the property would have sold for approximately $200,000 to $210,000.

Archuleta stated that she also attended the foreclosure sale set for December 5, 2001. The sale was held on a street corner adjacent to Royal Thrift's offices, and aside from Archuleta, was attended by two potential bidders. After a person from Royal Thrift verified that the two bidders had cashier's checks, the sale was postponed to December 12, 2001. When the bidders asked for an explanation, they were told that Royal Thrift had only a forged note regarding the property, and it could not guarantee a title because the property was caught up in litigation.

Archuleta subsequently attended the sale set for December 12, 2001, which was held in the same place. Two potential bidders appeared. The sale was postponed, and Royal Thrift's representatives stated that there was a risk that there was no valid deed. They also said that if Royal Thrift sold the property, the buyer had to assume the risk of defects in the title. When Archuleta asked

how many times the sale would be postponed, they replied, " '[A]s many times as necessary . . .' till '[Royal Thrift got] something from the court.' "

Archuleta later attended the sales set for December 19 and 28, 2001. According to Archuleta, no one else appeared at the sale location on December 28, 2001.

Aitken stated that he attended the sales set for January 8 and January 22, 2002, which were postponed by the trustee. On the latter date, the trustee's representative explained that the sale was postponed "due to action of law."

Aitken also attended the sale on January 31, 2002. On that date, the trustee explained that the sale was going forward "because the Supreme Court had rejected the Jones[es]' appeal." Two qualified buyers appeared at the sale, but only one—known to Aitken only as "Jody"—actually participated in the bidding. After the trustee read the notice of sale and recited the original sales date of December 5, 2001, the bidding began at $100,000, and proceeded in $100 increments. Royal Thrift eventually bought the property for $139,000. Aitken tried to talk to Jody, but the trustee waived him off, citing "privilege." The other qualified buyer told Aitken that he had not bid because there was "too much legal."

Aside from Treadwell's and Tonoyan's declarations, Royal Thrift responded with declarations from Marjorie Alatorre, a principal of the trustee, and Jody Angel, who bid on the property at the sale on January 31, 2002. Alatorre stated that she repeatedly postponed the sale at Royal Thrift's request, which was concerned about the validity of its trust deed. She also stated that the sale held on January 31, 2002, was properly conducted.

Angel stated that he is in the business of bidding on properties at foreclosure sales. According to Angel, he has no business or personal relationship with Royal Thrift, the trustee, or anyone else involved with the foreclosure sale, and his bidding at the sale was at "arm's length." There was nothing unusual about the sale, and he stopped bidding when the price exceeded what he wanted to pay for the property.

The record thus supports the inference that Royal Thrift acted reasonably in connection with the foreclosure proceedings. There is ample evidence that Royal Thrift and the trustee properly explained to prospective buyers that the postponements were due to legitimate concerns about the validity of the trust deed, and that no collusion or deceptive practices marred the eventual sale.

Appellants disagree, arguing at length that the evidence better supports their view. However, they misapprehend our role as an appellate

court. Review for substantial evidence is not trial de novo. (*Angela S. v. Superior Court* (1995) 36 Cal.App.4th 758, 762 [42 Cal.Rptr.2d 755].) When, as here, substantial evidence supports the trial court's actual conclusion, "it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards, supra*, 150 Cal.App.3d at p. 874, italics omitted.)

### 4. *Premature Notice*

Alternatively, appellants contend that if the first appeal stayed the foreclosure sale, Royal Thrift violated this stay in November 2001 by directing the trustee to notice the sale. According to this contention, Royal Thrift failed to mitigate its damages by *hastening* the sale, rather than by delaying it. Here, the trial court observed that Royal Thrift had noticed the sale during the first appeal, even though the "better practice" was to stay all proceedings, but it found no pertinent irregularity in the foreclosure proceedings that "should have taken place" after the appeal.

We conclude that substantial evidence supports these findings, to the extent that they bear on the mitigation of damages. As we have explained (see pt. I.A.1., *ante*), Royal Thrift's conduct is measured against a modest standard of reasonableness under this doctrine. Moreover, "[t]he reasonableness of the efforts of the injured party must be judged in the light of the situation confronting him at the time the loss was threatened and not by the judgment of hindsight. [Citations.]" (*Green v. Smith, supra*, 261 Cal.App.2d at pp. 396–397.)

Here, the record discloses that Tonoyan initially authorized the notice of sale upon hearing that our opinion in the first appeal had affirmed the validity of the trust deed, and then he repeatedly postponed the sale at the recommendation of Treadwell, who was concerned that our decision was not final. Even though the notice of sale, judged from our vantage point, violated the stay, this evidence raises the inference that Tonoyan then acted reasonably and in good faith to resolve the issue of Royal Thrift's damages.

We recognize that the better course would have been for Royal Thrift to have renoticed the sale when our remittitur issued on January 11, 2002. However, the trial court could have properly determined that renoticing the sale would have not affected the sales price on January 31, 2002, had Royal Thrift renoticed the sale for that date after the issuance of our remittitur, as permitted by statute. (Civ. Code, § 2924f, subd. (b)(1).) Prospective buyers at the postponed sales had been told about the potential defects in the trust deed, and one of the qualified buyers at the final sale declined to bid due to "too much legal." Such concerns would not have been cured by a fresh notice of sale.

### 5. *Failure to Conduct Foreclosure Sale Prior to First Appeal*

Finally, appellants contend that nothing prevented Royal Thrift from conducting a foreclosure sale following the Joneses' default in 1997, and thus it acted to enhance its recovery of interest, rather than to mitigate its damages. We are not persuaded.

"The fact that reasonable measures other than the one taken would have avoided damage is not, in and of itself, proof of the fact that the one taken, though unsuccessful, was unreasonable. [Citation.] 'If a choice of two reasonable courses presents itself, the person whose wrong forced the choice cannot complain that one rather than the other is chosen.' [Citation.]" (*Green v. Smith, supra,* 261 Cal.App.2d at p. 397.)

Here, Royal Thrift acted reasonably in waiting for a final determination that its trust deed was valid before foreclosing on it. Because Kramer's and County Escrow's misconduct jeopardized the validity of the trust deed, appellants cannot challenge Royal Thrift's choice of this course of action.

### B. *Leave to Amend Answer*

Star Insurance contends that the trial court incorrectly denied it leave to amend its answer following the bench trial. It argues that this ruling foreclosed the meritorious defense that Financial Code section 17205 (section 17205) barred Royal Thrift's claims against it as Kramer's and County Escrow's surety. This section states: "No action may be brought on an escrow agent's bond by any person after the expiration of two years from the time when the act or default complained of occurs." As we explain below, there was no error.

### 1. *Background*

"[Code of Civil Procedure] section 437 permits the trial court in its discretion to allow amendments to pleadings in the furtherance of justice. Ordinarily, courts should 'exercise liberality' in permitting amendments at any stage of the proceedings. [Citations.] In particular, liberality should be displayed in allowing amendments to answers, for a defendant denied leave to amend is permanently deprived of a defense." (*Hulsey v. Koehler* (1990) 218 Cal.App.3d 1150, 1159 [267 Cal.Rptr. 523].)

"[N]evertheless, whether such an amendment shall be allowed rests in the sound discretion of the trial court. [Citations.] And courts are much more critical of proposed amendments to answers when offered after long unexplained delay or on the eve of trial [citations], or where there is a lack of

diligence, or there is prejudice to the other party [citation]." (*Permalab-Metalab Equipment Corp. v. Maryland Cas. Co.* (1972) 25 Cal.App.3d 465, 472 [102 Cal.Rptr. 26].)

■■■ A party pleading a statute of limitations defense must allege the specific statutory basis for the defense, "and if such allegation be controverted, the party pleading must establish, on the trial, the facts showing the cause of action is so barred." (Code Civ. Proc., § 458.) Here, Star Insurance filed its answer to Royal Thrift's first amended complaint on February 9, 1999. It alleged only in general terms that Royal Thrift's claims were "barred by the applicable Statute of Limitations."

On April 8, 1999, Star Insurance filed a motion for summary judgment or adjudication against Royal Thrift, contending that section 17205 barred Royal Thrift's claims. Royal Thrift opposed the motion, arguing that (1) Star Insurance had not pleaded a defense under section 17205 in its answer, (2) it was otherwise estopped from asserting a defense under this section, (3) the pertinent limitations period was equitably tolled due to Kramer's and County Escrow's concealment of the fraudulent loan, and (4) Royal Thrift had timely filed its claims within the limitations period. On May 19, 1999, the trial court determined that there were triable issues of fact regarding all of these matters, and denied the motion.

Star Insurance took no action to amend its answer until June 15, 2000, the last day of the bench trial, when its counsel announced—without referring to section 17205—that he wished to make a motion for leave to amend the answer to conform to proof. The trial court asked him to make this motion during his closing argument, and he agreed.

The trial court's statement of decision denied this motion as untimely. It also states: "[T]he court further finds that the statute of limitations in question was equitably tolled until the filing of the within action by [the Joneses] on October 23, 1997, which was the first time that Royal Thrift had notice of breach of an obligation owed to them by the escrow officer."

### 2. *Delayed Discovery Rule*

In our view, the trial court did not err. As we explain below, the limitations period in section 17205 is subject to the delayed discovery rule, and thus Star Insurance's belated request for an amendment would have impaired Royal Thrift's opportunity to present evidence relevant to this rule at trial.

■■■ The question presented is one of first impression. Section 17205, in its original form, was enacted in 1951 (Stats. 1951, ch. 364, § 17205, p. 1109)

as part of a comprehensive statutory scheme known as the "Escrow Law" (Fin. Code, § 17000 et seq.), but no court has interpreted the limitations provision of section 17205. As the court explained in *Escrow Institute of Cal. v. Pierno* (1972) 24 Cal.App.3d 361, 366 [100 Cal.Rptr. 880], the Escrow Law is intended to "protect[] the public from unfair, fraudulent and incompetent service in the handling of escrows."

Generally, statutes of limitation are triggered on the date of injury, and the plaintiff's ignorance of the injury does not toll the statute. (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 826 [195 Cal.Rptr. 421].) However, by judicial decision or statute, the harshness of this principle has been mitigated in some cases through the so-called delayed discovery rule. (*Moreno v. Sanchez* (2003) 106 Cal.App.4th 1415, 1423–1424 [131 Cal.Rptr.2d 684].) Under the delayed discovery rule, "the limitations clock only begins to run on certain causes of action when the injured party discovers or should have discovered the facts supporting liability. [Citations.]" (*Davies v. Krasna* (1975) 14 Cal.3d 502, 512–513 [121 Cal.Rptr. 705, 535 P.2d 1161].)

California courts have long applied the delayed discovery rule to claims involving difficult-to-detect injuries or the breach of a fiduciary relationship. (*Moreno v. Sanchez, supra,* 106 Cal.App.4th at pp. 1423–1424.) Thus, in *Marsh v. Industrial Acc. Com.* (1933) 217 Cal. 338, 341–353 [18 P.2d 933], our Supreme Court held that the delayed discovery rule governed injury claims under former workers' compensation law, even though that law required such claims to be initiated within six months of the date of the injury. Here, an escrow agent is a fiduciary of the parties to the escrow (*Summit Financial Holdings, Ltd. v. Continental Lawyers Title Co.* (2002) 27 Cal.4th 705, 711 [117 Cal.Rptr.2d 541, 41 P.3d 548]), and thus our Supreme Court has determined that the discovery rule applies to claims by these parties against their escrow agent (*Amen v. Merced County Title Co.* (1962) 58 Cal.2d 528, 534 [25 Cal.Rptr. 65, 375 P.2d 33]).

In our view, the delayed discovery rule also applies to section 17205, which governs actions on an escrow agent's *bond*. Absent exceptional circumstances, a surety's liability is commensurate with that of the principal (*Scott Co. v. United States Fidelity & Guaranty Ins. Co.* (2003) 107 Cal.App.4th 197, 214 [132 Cal.Rptr.2d 89]; Civ. Code, § 2809), and the surety's liability accrues when the principal's liability accrues (*Bloom v. Bender* (1957) 48 Cal.2d 793, 799 [313 P.2d 568]). Thus, in *Haswell v. Costellenos* (1932) 126 Cal.App. 427, 428–434 [14 P.2d 846], the court held that the delayed discovery rule incorporated into the three-year statute of limitations for fraud claims (Code Civ. Proc., § 338, subd. (d)) governs the accrual of causes of action against a real estate broker *and* his surety.

Under these principles, we conclude that the delayed discovery rule applies to section 17205. The contrary conclusion would bar defrauded parties to an escrow from recovering on the escrow agent's bond when they fail to discover the fraud within two years, notwithstanding their timely assertion of claims against the escrow agent under the delayed discovery rule. This result would defeat the intent of the Escrow Law, namely, to protect the public in cases of fraudulent conduct by escrow agents.

### 3. *Application to Present Case*

In the present case, the trial court properly refused Star Insurance leave to amend its answer, given that this belated amendment would have denied Royal Thrift a full opportunity to present evidence at trial regarding its discovery of the fraudulent conduct by Kramer and County Escrow. (*Bank of United States v. Foreman* (1929) 102 Cal.App. 756, 764 [283 P. 874] [party may not amend its pleading after trial to raise new issues not raised in original pleading].)

However, even if the trial court erred in this matter, Star Insurance cannot establish prejudice because the defense that it intended to plead is meritless. As we have explained (see pt. I.B.1., *ante*), the trial court found that Royal Thrift first had notice of the fraudulent conduct on October 23, 1997, when the Joneses initiated the underlying action. This finding is supported by the trial testimony from Tonoyan, who indicated that Royal Thrift learned about a potential forgery in mid-1997, at about the time that the Joneses began their lawsuit. In view of this finding and the delayed discovery rule, Royal Thrift filed its original cross-complaint in a timely manner on June 17, 1998, that is, within two years of the accrual of its claims against Star Insurance, as required under section 17205.

In sum, the trial court properly denied Star Insurance's request to amend its answer.

### C. *Bond*

Finally, Star Insurance contends that a provision in its bond precludes its liability to Royal Thrift. This provision states: "[A]ny person who sustains an injury covered by this bond may, in addition to any other remedy that he may have, bring an action in his own name upon this bond for the recovery of any damages sustained by him; provided, however, that no such action may be brought after the expiration of two years from and after the act or default complained of may have occurred." As we explain below, this provision does not establish a limitations period that is independent of section 17205, and thus Star Insurance's contention fails.

The interpretation of this provision is a question of law when, as here, there is no extrinsic evidence bearing on its meaning. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865 [44 Cal.Rptr. 767, 402 P.2d 839].) "The paramount rule governing the interpretation of contracts is to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as it is ascertainable and lawful [citation]. The [in]tention of the parties must, in the first instance, be derived from the language of the entire contract." (*Leo F. Piazza Paving Co. v. Foundation Constructors, Inc.* (1981) 128 Cal.App.3d 583, 591 [177 Cal.Rptr. 268], italics deleted.)

In our view, the intent of the provision in question was merely to import section 17205 into the bond, and thus the provision is subject to the delayed discovery rule. Financial Code section 17203 states that "[t]he bond of an escrow agent shall be conditioned that the licensee will faithfully conform to and abide by the provisions of [the Escrow Law]," and the bond *itself* contains a term that tracks section 17203.[4] Furthermore, the provision in question closely matches the language of section 17205, as originally enacted.[5] Accordingly, this provision is not independent of section 17205.

However, even if the provision marks an attempt to depart from section 17205, it would not displace the delayed discovery rule. In *Moreno v. Sanchez, supra,* 106 Cal.App.4th 1415, the court addressed a similar question concerning Business and Professions Code section 7199, which imposes a four-year limitations period on actions against home inspectors. In that case, two prospective homeowners entered into a contract with a home inspector that required actions against him to be initiated within one year of the inspection. (*Id.* at pp. 1419–1420.) The court in *Moreno* held that this contractual limitations period was nonetheless subject to the delayed discovery rule, citing the policy considerations underlying the rule and the brevity of the contractual limitations period. (*Id.* at pp. 1423–1434.)

As we have explained (see pt. I.B.2., *ante*), similar policy considerations also subject section 17205 to the delayed discovery rule. In view of *Moreno*,

---

[4] The bond states in pertinent part: "The said principal [County Escrow] and any and all agents and employees representing said principal shall faithfully conform to and abide by the provisions of the said Escrow Law and all acts amendatory thereof and supplementary thereto now and hereafter enacted . . . ."

[5] As originally enacted, Financial Code section 17205 provided: "In addition to any other remedy, any person who sustains an injury covered by an escrow agent's bond may bring an action in his own name upon the bond for the recovery of any damages sustained by him. No action may be brought on the bond by any person after the expiration of two years from the time when the act or default complained of occurs." (Stats. 1951, ch. 364, § 17205, p. 1109.) In 1982, the first sentence of Financial Code former section 17205 was deleted because it duplicated a provision in the general statutes governing bonds (Code Civ. Proc., § 995.850). (Cal. Law Revision Com. com., 30B West's Ann. Fin. Code (1999 ed.) foll. § 17205 at p. 169.)

Star Insurance cannot avoid the application of this rule by means of a distinct limitations period in its bond, especially when Royal Thrift was not a party to the bond.

## II.[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Epstein, P. J., and Grimes, J., concurred.

---

[*]See footnote, *ante*, page 24.